COMMONWEALTH *against* WATMOUGH.

6wh117
137 148
6wh117
146 355
Wharton.
6wh117
156 380

[PHILADELPHIA, JANUARY 16TH, 1841.]

IN ERROR.

1. In an action against a sheriff for an alleged false return of *nulla bona* to a writ of *fi. fa.*, by which he was required to levy upon certain bank stock, standing in the name of A., the defendant in the execution; *it was held*, that A. was a competent witness to prove that the stock was in fact purchased with the money of his brother, and that he had sold it to B. before the *fi. fa.* issued; although he (A.) had agreed to indemnify C. for being security to the sheriff for not levying on the stock; C. having executed a release to the witness.

2. Stock in a bank, or other corporation, standing in the name of a defendant in an execution, is not liable to be sold as his, under the act of the 29th of March, 1819, if it actually be the property of another.

3. A., a stockholder in the Bank of the U S., sold his stock on the 22d of April, 1836, taking from the purchaser his promissory note at 60 days; and on the same day executed a power of attorney to transfer it. On the 6th of May, 1836, a levy was made upon the stock, which still stood in the name of A., by the sheriff, by virtue of a *fi. fa.* against A. : *Held*, that the stock was not liable to execution; although the rules of the Bank required transfers of the stock to be made in the presence of an officer of the Bank.

4. A sheriff is not bound to levy upon personal property alleged to belong to the defendant in an execution, upon an offer by the plaintiff to indemnify him. Unless it appear in an action against him for a false return, that the property actually belonged to the defendant in the execution, the offer to indemnify him will not make him liable to damages.

ERROR to the District Court for the City and County of Philadelphia.

This was an action of debt upon the official bond of the sheriff of the city and county of Philadelphia, brought in the name of the Commonwealth of Pennsylvania, to the use of John C. Bergh and John P. Arcularius, copartners, trading under the firm of Bergh & Arcularius, against John G. Watmough, Esq., George W. South, and Isaac Heylin.

(Commonwealth *v.* Watmough.)

The plaintiffs declared generally upon the sheriff's bond; to which the defendants pleaded peformance as respected the persons to whose use the suit was brought.

The plaintiffs replied; assigning breaches as follows:

" And the said plaintiffs, by Samuel H. Perkins, their attorney, say, that they the said plaintiffs by reason of anything by the said defendants in their plea alleged ought not to be barred from having and maintaining their aforesaid action thereof against them, the said defendants, because they say that whereas they, the said plaintiffs, heretofore, to wit, on the thirtieth day of April, 1835, in the District Court for the City and County of Philadelphia, by consideration and judgment of the said court, recovered against one Joshua T. Seal, the sum of seventeen hundred sixty-nine dollars and forty-four cents, which was adjudged to the plaintiffs in and by the said court for their damages by them sustained, as well on occasion of the not performing certain promises and undertakings before then made by the said Joshua T. Seal to the said plaintiffs, as for their costs and charges, by them the said plaintiffs about their suit in that behalf expended, whereof the said Joshua T. Seal was convicted; as by the record and proceedings thereof still remaining in the said court more fully and at large appears. And the said plaintiffs further say, that the said judgment being in full force, and the said damages remaining unpaid and unsatisfied, they the said plaintiffs, on the seventh day of March, eighteen hundred and thirty-six, for the obtaining satisfaction thereof, sued and prosecuted out of the said court at the county aforesaid, a certain writ called an *alias fieri facias,* directed to the sheriff of Philadelphia county, by which said writ the Commonwealth of Pennsylvania commanded the said sheriff as before they had done, that of the goods and chattels, lands and tenements of the said Joshua T. Seal, in his, the said sheriff's, bailiwick, he should cause to be levied seventeen hundred and ninety-two dollars eighty-three cents, which to the said plaintiffs lately in the said court were adjudged for their damages which they sustained as well by occasion of the non-performanc of a certain promise and assumption by the said Joshua T. Seal, to the said plaintiffs at Philadelphia, in the county aforesaid made, as for their costs and charges by them about their suit in that behalf expended, whereof the said Joshua T. Seal was convicted, as appears of record; and that he should have that money before the judges of the said court at Philadelphia, at the said court there to be held the first Monday of June then next, to render to the said plaintiffs for their damages aforesaid: and that the said sheriff should have then there that writ; which said writ afterwards, and before the delivery thereof to the said sheriff, as hereinafter mentioned, was duly endorsed with a direction for him the said sheriff to levy seventeen hundred sixty-nine dollars forty-four cents, besides interest and costs; and

(Commonwealth v. Watmough.)

which said writ so endorsed, afterwards and before the said return thereof, to wit, on the sixth day of May, eighteen hundred and thirty-six, at the county aforesaid, was delivered to the said John G. Watmough; who then and from thence until and at and after the return of the said writ was sheriff of the said county of Philadelphia, to be executed in due form of law. By virtue of which said writ the said John G. Watmough, so being sheriff of Philadelphia county, as aforesaid, afterwards and before the return of said writ, to wit, on the day and year last aforesaid, at the county aforesaid, seized and took in execution divers goods and chattels of the said Joshua T. Seal, of great value, to wit, of the value of the moneys so endorsed on the said writ, and directed to be levied as aforesaid, and then and there levied the same thereout. Yet the said John G. Watmough, so being such sheriff of Philadelphia county as aforesaid, not regarding his duty as such sheriff, but contriving and wrongfully and unjustly intending to injure, prejudice, and aggrieve the said plaintiff in that behalf, and to deprive him of the said moneys so endorsed on the said writ and directed to be levied as aforesaid, and of the means of obtaining the same had not the said moneys, so levied as aforesaid, or any thereof before the judges of the said court at Philadelphia aforesaid, at the return of the said writ, according to the exigency thereof, and of the said endorsement so made thereon as aforesaid, but therein wholly failed and made default; nor hath he paid the said sum of seventeen hundred and sixty-nine dollars forty-four cents, or any part thereof to the said plaintiffs, and at the return of the said writ, to wit, on the first Monday of June, in the year last aforesaid, the said John G. Watmough falsely and decitfully returned to the said court upon said writ, that the said Joshua T. Seal had not any goods and chattels in his bailiwick whereof he could cause to be levied the damages aforesaid, or any part thereof; as by the said writ and the return thereof remaining of record in the said court at Philadelphia aforesaid fully appears; by means of which said premises the said plaintiffs have been and are greatly injured and deprived of the means of obtaining the said moneys so endorsed on the said writ and directed to be levied as aforesaid, and which are still wholly unpaid; and are likely to lose the same, to wit, at the county aforesaid, contrary to the form and effect of the said condition of the said writing obligatory, to wit, at the county aforesaid. And this the said plaintiffs are ready to verify: wherefore they pray judgment and their debt aforesaid, together with their damages by them sustained on occasion of the detention thereof, to be awarded them.

And the said plaintiffs further say, that they, the said plaintiffs, by reason of any thing by the said defendants in their plea alleged, ought not to be barred from having and maintaining their aforesaid action thereof against them the said defendants, because they say that, whereas, they, the said plaintiffs heretofore, to wit, on the 30th

(Commonwealth *v.* Watmough.)

day of April, eighteen hundred and thirty-five, in the District Court for the City and County of Philadelphia, by the consideration and judgment of the said court, recovered against one Joshua T. Seal, the sum of seventeen hundred and sixty-nine dollars, forty-four cents, which was adjudged to the said plaintiffs in and by said court, for their damages which they sustained, as well on occasion of the not performing certain promises and undertakings before then made by the said Joshua T. Seal to the said plaintiffs as for their costs and charges by them the said plaintiffs about their suit in that behalf expended, whereof the said Joshua T. Seal was convicted; as by the records and proceedings thereof still remaining in the said court, more fully and at large appears. And the said plaintiffs further say, that the last mentioned judgment being in full force, and the said last mentioned damages remaining unpaid and unsatisfied, they, the said plaintiffs, on the *seventh* day of March, eighteen hundred and thirty-six, for the obtaining satisfaction thereof, sued and prosecuted out of the said court at the county aforesaid, a certain writ called an *alias fieri facias* directed to the said sheriff of Philadelphia county, by which said last mentioned writ the Commonwealth of Pennsylvania commanded the said sheriff as before they had done, that of the goods, and chattels, lands and tenements of. the said Joshua T. Seal in his the sheriff's bailwick he should cause to be levied seventeen hundred and ninety-two dollars and eighty-three cents, which to said plaintiffs lately in the said court were adjudged for their damages which they sustained, as well by occasion of the non-performance of a certain promise and assumption of the said Joshua T. Seal, to the said plaintiffs at Philadelphia, in the county aforesaid made, as for their costs and charges about their suit in that behalf expended, whereof the said Joshua T. Seal was convicted, as appears of record, and that he should have that money before the judges of the said court at Philadelphia, at the said court, there to be held the first Monday of June then next, to render to the said plaintiffs for their damages aforesaid, and that the said sheriff should have then there that writ; which said last mentioned writ afterwards and before the delivery thereof to the said sheriff, as hereinafter mentioned, was duly endorsed, with a direction for him, the said sheriff, to levy seventeen hundred and sixty-nine dollars forty-four cents, besides interest and costs, and which said last mentioned writ so endorsed, afterwards and before the said return thereof, to wit, on the sixth day of May, eighteen hundred and thirty-six, at the county aforesaid, was delivered to the said John G. Watmough, who then, and from thence, until and at, and after the return of the said last mentioned writ, was sheriff of Philadelphia county, to be executed in due form of law. And although there were then and afterwards and before the return of the said last mentioned writ, divers goods and chattels of the said Joshua T. Seal within the bailwick of the said sheriff, whereof the said John

G. Watmough could, might, and ought to have levied the moneys so endorsed on said last mentioned writ, and directed to be levied as last aforesaid, whereof the said John G. Watmough so being sheriff as aforesaid, had notice.    Yet the said John G. Watmough so being sheriff as aforesaid, not regarding the duty of his office as such sheriff, but contriving, and wrongfully and unjustly intending to in-jure, prejudice, and aggrieve the said plaintiffs, and to deprive them of the moneys so endorsed on the said last mentioned writ, and directed to be levied as last aforesaid, and of the means of obtain-ing the same, did not nor would at any time before the return of the said writ, levy the money last aforesaid, or any part thereof, but wholly neglected and refused so to do, and therein failed and made default, and at the return of the said last mentioned writ, to wit, on the first Monday of June, eighteen hundred and thirty-six, falsely and deceitfully returned to the said court, that the said Joshua T. Seal had not any goods in his bailiwick whereof he could cause to be levied the damages last aforesaid, or any part thereof: as by the said last mentioned writ and the return thereof remaining of record in the said court of the county aforesaid, fully appears.  By means of which premises the said plaintiffs have been and are greatly injured and deprived of the means of obtaining the said moneys so endorsed on the said last mentioned writ, and directed to be levied as afore-said, and which are still wholly unpaid as aforesaid, and are likely to lose the same, to wit, at the county aforesaid; contrary to the form and effect of the said condition of the said writing obligatory, to wit, at the county aforesaid : And this the said plaintiffs are ready to verify : Wherefore they pray judgment and their damages aforesaid to be awarded them.

And the said plaintiffs further say, that by reason of any thing by the said defendants in their plea alleged they the said plain-tiffs ought not to be barred from having and maintaining their aforesaid action thereof against them the said defendants, be-cause they say that whereas they, the said plaintiffs, heretofore, to wit, on the thirtieth day of April, eighteen hundred and thirty-five, in the District Court for the City and County of Philadelphia, by the consideration and judgment of the said court, recovered against one Joshua T. Seal a certain debt of thirteen hundred and eighty-nine dollars and fifty-six cents, and also three hundred seventy-nine dol-lars and eighty-eight cents, which in and by said court were adjudged to the said plaintiffs, and with their assent for damages which they had sustained, as well by occasion of the detention of that debt as for their costs and charges by them about their suit in that behalf expended, whereof the said Joshua T. Seal was convicted : as by the records and proceedings thereof still remaining in the said court, more fully and at large appears.    And the said plaintiffs further say, that the said judgment being in full force, and the said debt and damages remaining unpaid and unsatisfied, they, the said plaintiffs,

(Commonwealth *v.* Watmough.)

on the seventh day of March, eighteen hundred and thirty-six, for the obtaining satisfaction thereof, sued and prosecuted out of the said court, at the county aforesaid, a certain writ of *alias fieri facias*, directed to the sheriff of Philadelphia county, by which said last mentioned writ, the Commonwealth of Pennsylvania commanded the said sheriff, as before they had done, that of the goods, chattels, lands, and tenements of the said Joshua T. Seal, in his the said sheriff's bailiwick, he should cause to be levied the debt and damages aforesaid, and that he should have that money before the judges of the said court at Philadelphia, at the said court there to be held the first Monday of June then next, and that the said sheriff should have then there that writ. Which said last mentioned writ, afterwards and before the delivery thereof to the said sheriff, as hereinafter mentioned, was duly endorsed, with a direction for him, the said sheriff, to levy seventeen hundred and sixty-nine dollars, forty-four cents, besides interest and costs, and which said last mentioned writ, so endorsed and directed as aforesaid, afterwards and before the return thereof, to wit, on the sixth day of May, eighteen hundred and thirty-six, at the county aforesaid, was delivered to the said John G. Watmough, who then and from thence until and at and after the return of the said last mentioned writ, was sheriff of Philadelphia county, to be executed in due form of law. By virtue of which said last mentioned writ, the said John G. Watmough, so being sheriff of Philadelphia county as aforesaid, seized and took in execution divers goods and chattels of the said Joshua T. Seal, of great value, to wit, of the value of the moneys so endorsed on the said last mentioned writ and directed to be levied as aforesaid, and then and there levied the same thereout. Yet the said John G. Watmough, so being such sheriff as aforesaid, not regarding his duty as said sheriff, but contriving, and wrongfully, and unjustly intending to injure, prejudice, and aggrieve, the said plaintiffs in that behalf, and to deprive them of the said money so endorsed on the said last mentioned writ, and directed to be levied as aforesaid, and of the means of obtaining the same, had not the said moneys so levied as aforesaid, or any part thereof before the judges of the said court at Philadelphia, aforesaid at the return of the said last mentioned writ, according to the exigency thereof and of the said endorsement, so made thereon as aforesaid, but therein wholly failed and made default, nor hath he paid the said sum of seventeen hundred sixty-nine dollars and forty-four cents, or any part thereof, to the said plaintiffs, and at the return of said writ, to wit, on the first Monday of June, eighteen hundred and thirty-six, he, the said John G. Watmough, falsely and deceitfully returned to the said court at Philadelphia aforesaid, upon the said last mentioned writ that the said Joshua T. Seal had not any goods and chattels in his bailiwick whereof he could cause to be levied the said debt and damages aforesaid or any part thereof: as by the said writ and the return thereof remaining of record in the said court fully appears: by means

of which said premises the said plaintiffs have been and are greatly injured and deprived of the means of obtaining the said moneys so endorsed on the said writ and directed to be levied as aforesaid, and which are still unpaid as aforesaid, and are likely to lose the same, to wit, at the county aforesaid; contrary to the form and effect of the said condition of the said writing obligatory, to wit, at the county aforesaid: and this they the said plaintiffs are ready to verify: Wherefore they pray judgment and their debt aforesaid, together with their damages by them sustained on occasion of the detention thereof, to be adjudged to them.

And the said plaintiffs further say, that they, the said plaintiffs, by reason of any thing by the said defendants in their plea alleged, ought not to be barred from having or maintaining their aforesaid action against them, the said defendants, because they say that whereas they the said plaintiffs heretofore, to wit, on the thirtieth day of April, eighteen hundred and thirty-five, in the District Court for the city and county of Philadelphia, by the consideration and judgment of the said court, recovered against one Joshua T. Seal, a certain debt of thirteen hundred eighty-nine dollars and fifty-six cents; and also three hundred seventy-nine dollars and eighty-eight cents; which in and by the said court were adjudged to the said plaintiffs, and with their assent for damages which they had sustained, as well by occasion of the detention of that debt, as for their costs and charges by them about their suit in that behalf expended, whereof the said Joshua T. Seal was convicted; as by the records and proceedings thereof still remaining in the said court more fully and at large appears. And the said plaintiffs further say, that the said judgment being in full force, and the said debt and damages remaining unpaid and unsatisfied, they the said plaintiffs, on the seventh day of March, eighteen hundred and thirty-six, for the obtaining satisfaction thereof, sued and prosecuted out of the said court, at the county aforesaid, a certain writ of *alias fieri facias*, directed to the sheriff of Philadelphia county, by which said last mentioned writ the commonwealth of Pennsylvania commanded the said sheriff as before they had done, that of the goods and chattels, lands and tenements of the said Joshua T. Seal, in his, the said sheriff's, bailiwick, he should cause to be levied the debt and damages aforesaid, and that he should have that money before the judges of the said court, at Philadelphia, at the said court, there to be held the first Monday of June then next; and that the said sheriff should have then there that writ. Which said last mentioned writ, afterwards, and before the delivery thereof to the said sheriff as hereinafter mentioned, was duly endorsed with a direction for him the said sheriff to levy seventeen hundred and sixty-nine dollars forty-four cents, besides interest and costs; and which said last-mentioned writ, so endorsed, afterwards and before the said return thereof, to wit, on the sixth day of May, eighteen hundred and thirty-six, at the county aforesaid, was deliv-

(Commonwealth *v.* Watmough.)

ered to the said John G. Watmough, who then and from thence until and at and after the return of the said last mentioned writ was sheriff of Philadelphia county, to be executed in due form of law: and although there were then, and afterwards and before the return of said writ, divers goods and chattels of the said Joshua T. Seal within the bailiwick of the said John G. Watmough as such sheriff as aforesaid, whereof the said John G. Watmough could and might and ought to have levied the moneys so endorsed on the said last-mentioned writ, and directed to be levied as last aforesaid, whereof the said John G. Watmough, so being sheriff as aforesaid had notice; yet the said John G. Watmough, so being sheriff of Philadelphia county as aforesaid, not regarding the duty of his office as such sheriff, but contriving and wrongfully and unjustly intending to injure, prejudice and aggrieve the said plaintiffs, and to deprive them of the moneys so endorsed on the said last mentioned writ, and directed to be levied as last aforesaid, and of the means of obtaining the same, did not nor would at any time before the return of the said last mentioned writ, levy the money last aforesaid, or any part thereof, but wholly neglected and refused so to do, and therein failed, and made default, and at the return of the said last mentioned writ, to wit, on the first Monday of June, eighteen hundred and thirty-six, falsely and deceitfully returned to the said court, that the said Joshua T. Seal had not any goods and chattels in his bailiwick whereof he could cause to be levied the debt and damages last aforesaid, or any part thereof: as by the said last mentioned writ and the return thereof, remaining on record in the said court at the county aforesaid fully appears. By means of which premises the said plaintiffs have been and are greatly injured and deprived of the means of obtaining the said moneys so endorsed on the said last mentioned writ and directed to be levied as aforesaid, and are still wholly unpaid as aforesaid, and are likely to lose the same, to wit, at the county aforesaid; contrary to the form and effect of the said condition of the said writing obligatory, to wit, at the county aforesaid; and this the said plaintiffs are ready to verify. Wherefore they pray judgment and their debt aforesaid, together with their damages by them sustained on occasion of the detention thereof to be adjudged to them."

The defendants rejoined as follows:

" And the said defendants, as to the plea of the said plaintiff above, in reply pleaded to the plea of the said defendants say, that the plaintiff, by reason of any thing by him in his said plea in reply alleged ought not to have or maintain his aforesaid action thereof against the defendants, because they say, as to the first and third pleas of the plaintiff pleaded in reply, that the said John G. Watmough, sheriff as aforesaid, did not take in execution the goods and chattels of the said Joshua T. Seal, as in the said pleas alleged: and that the

(Commonwealth v. Watmough.)

said Joshua T. Seal had no goods and chattels in his bailiwick at and after the delivery and before the return of the said writ of *fieri facias* in the said pleas mentioned, whereof the said debt could be levied : and as to the second and fourth pleas of the plaintiff, pleaded in reply, that there were not divers goods and chattels of said Seal within his bailiwick, whereof the said sheriff could, might and ought to have levied the money, endorsed on the said writ; whereof he had notice, as in the said pleas mentioned : and of this they put themselves on the country," &c.

Issues having been taken on these pleading, the cause came on for trial before PETTIT, (Pres't,) on the 4th day of February, 1839; when the plaintiff's counsel gave in evidence the official bond of the sheriff; and also gave in evidence the record of a suit and judgment, in the District Court for the City and County of Philadelphia, to December Term, A. D. 1834, No. 280, in which John C. Bergh, and John P. Arcularius, co-partners in trade under the firm of Bergh & Arcularius, were plaintiffs, and Joshua T. Seal was defendant; and in which there was judgment for the plaintiffs against the said Joshua T. Seal, for the sum of $1769 44, on the 30th of April, 1834.

They also gave in evidence a *fi. fa.* issued on the said judgment to June Term, A. D. 1835, No. 188, and tested the 4th day of May, A. D. 1835, and the return of "*nulla bona*" thereon endorsed. Also a *ca. sa.* to the same term No. 189, and the return of N. E I. thereon endorsed.

They also gave in evidence an *alias fi. fa.* in favour of the plaintiffs against the said Joshua T. Seal, on the same judgment for the said sum of $1769 44 and costs, No. 31, June Term, 1836, and endorsed as having been left in the sheriff's office, May 6th, 1836, at 12 o'clock, A. M., and the return. endorsed thereon by the said John G. Watmough, sheriff, of "*nulla bona,*" and also endorsed in pencil marks, "Bank Stock."

The counsel for the plaintiffs then gave in evidence a paper which was produced from the United States Bank, in the words and figures following :

|  |  |
|---|---|
| Lev. upon by the Sheriff past 12, May 6, 1836, Joshua T. Seal. | John C. Bergh & John P. Arcularius, Copartners, *vs.* Joshua T. Seal. |

PERKINS, Attorney.

Al. Fi. Fa.    No. 31.
June Term, 1836.

Debt $1769 44.

Which paper was endorsed in the hand-writing of the said John G. Watmough, as sheriff, in the words and figures following, to wit:

"I hereby relieve the officers of the Bank of the United States from all responsibility in the case annexed; and in person take off the injunction laid upon the stock of Joshua T. Seal, the said stock to be transferred to Samuel Parker.

May 31st, 1836.          JOHN G. WATMOUGH, Sheriff."

The counsel for the plaintiffs then called—

Andrew Sommers, who testified as follows,—"I am a clerk in the Bank of the United States; I was at that time (when the levy was made) the 'Transfer clerk.' Fifteen share of the stock of that bank were transferred on the first of June, 1836, by Joshua T. Seal to Samuel Parker, from the stock of Mr. Seal. These fifteen shares had been standing in the name of Joshua T. Seal from the 18th of April, 1836; it was above par; how much I do not know. It was the highest range above par at that time. It was from 15 to 20 above par." Being cross-examined, he said; "It (the stock) was transferred on the books of the bank by Jesse Sharpe, under power of attorney from Joshua T. Seal, which has been in bank ever since. I can't state positively what it (stock) was at, it was continually fluctuating, it was a time of great speculation: stock constantly changing hands; can't state the price of stock, nor whether it was under 15."

The plaintiffs also examined a witness, who testified that sales of United States Bank stock were made as high as 128 or 129 in July and August, 1836.

The plaintiff's counsel then gave in evidence a notice from himself to the sheriff, dated May 28th, 1836, and served upon the sheriff the same day, requiring him to proceed and sell the bank stock, and offering security, if required.

The counsel of the defendants then offered Joshua T. Seal as a witness, to prove the sale of the stock by him to Jesse Sharpe. The counsel of the plaintiffs objected to him as incompetent, by reason of his interest; but the learned judge overruled the objection, and admitted him as a witness for the purpose; to which decision the counsel of the plaintiffs excepted; and he testified as follows;—

"I had sold these fifteen shares of stock; I don't recollect the day; I sold Jesse Sharpe fifteen shares of United States Bank stock on the 22d of April, 1836, for $120 or $120 50, per share; I took his note, payable at 60 days, which was paid. I gave the certificate of the stock to Mr. Sharpe, with the power of attorney in Wilmington. I executed the power of attorney. It was all done at the same time." On his cross-examination he testified: "Jesse Sharpe is a

(Commonwealth v. Watmough.)

tavern-keeper in Wilmington: was in 1836; kept the La Fayette Hotel; deals pretty largely in stock, through Mr. Benson. The note was paid when it became due; I believe on the very day it became due. I received the money for it on the very day it was due from Jesse Sharpe, at Wilmington. The note was not put in bank. He paid me in bankable paper, at my office, I suppose; no one that I recollect was present when the note was paid. I don't know whether I deposited the money in bank, or not; I kept no bank account myself, my brother kept it. I am a clerk in the store of my brother. The note was not mine; I was doing business for my brother; it was his. I don't recollect making an affidavit that this stock was mine. This stock ought to have gone into my brother's name. I bought this stock in the city of Philadelphia, of S. & M. Allen, brokers. I gave about one hundred and fifteen or one hundred and sixteen dollars per share for it. Mr. Sharpe don't drive stage, he carries the mail. I can't say that I ever sold stock to Sharpe before this time. I never agreed to save Sharpe harmless. Sharpe and Parker signed the bond to the sheriff, I don't think I did. Sharpe gave Parker the stock as collateral security; he is safe enough. Mr. Parker took it for that. I came up with Sharpe. I called on Mr. Parker with him; I knew him, and Sharpe did not. I introduced him to Mr. Parker to go security to the sheriff. I told him Sharpe was safe enough. I told Mr. Parker I would go Sharpe's security for him, and that if Sharpe did not make up the stock to him I would; I would go security for him."

The counsel for the plaintiffs thereupon asked the court to strike out all of the testimony of the witness.

The counsel for the defendant then proposed to ask the witness as to the sale of stock by Parker, and as to the amount Parker got for the stock; to which question the plaintiffs' counsel objected; but the court overruled the objection, and admitted the testimony, to which the plaintiffs' counsel excepted.

The witness then stated in answer to questions by defendant's counsel:

" Mr. Parker sold the stock for about $123 or $124 per share, or something in that neighbourhood. It was for more than enough to pay this claim. He sold it a short time after the transfer to him; he told me so. He never asked me for any instrument of writing; never made any claim against me."

On the cross-examination being resumed by the plaintiffs' counsel, the witness stated:

" I don't know to whom Mr. Parker sold this stock. I bought goods from him for my brother. No part of the proceeds of the

(Commonwealth v. Watmough.)

stock went to pay for those goods. I believe Sharpe has got part of the money for this stock. Mr. Parker settled it all. He gave him a receipt for the stock, that whenever this suit was settled, he would pay it over. Mr. Sharpe has got the money for the stock, Mr. Parker paid it over to him in my presence. Mr. Parker paid the money to me for Sharpe. Sharpe gave me a receipt to get the money. I gave that receipt to Mr. Parker. I brought the receipt up and got the money and took it down to Wilmington. I paid the whole of the money over to Sharpe. The note which Sharpe had given me for this stock was not in my possession when the money was paid by Parker."

In answer to a question by the court, the witness said:—" Mr. Parker has now nothing in his hands but Sharpe's security, and I to back him."

The counsel for defendants then drew up a release at bar from Mr. Parker to the witness, dated February 4th, 1839, which was duly executed, and the evidence previously given was agreed to be considered as if given after the release.

The counsel for the plaintiffs again objected to the competency of the witness, but the court overruled the objection, and the counsel for the plaintiffs again excepted.

The witness proceeded:—" I took down Mr. Parker's notes to Sharpe for the stock. My father or brother gave me the money for those notes, and I gave it to Sharpe. There were one or two notes; I am not certain which. I don't recollect in whose favour the notes were drawn, nor whether I put my name on them or not. The note was not over thirty or sixty days. I took the notes directly to my father or brother and got the money. I did not take the notes to Sharpe. Sharpe never saw the notes till I handed him the money. If they were to my order, I endorsed them. My brother is two years younger than myself. He was born in 1805; is in the flour business. I knew of this judgment against me when I transferred this stock to Sharpe. I don't know that he knew of it. I never paid the expenses of his coming up. In April, 1833, I went into business for my brother in Wilmington. The store belongs to my father. I get a salary. I have a power of attorney to sign checks for my brother. I can't say whether I drew the money for Parker's note on this power of attorney or not. I sign his checks. I deposit all money to the credit of my brother. The proceeds of Sharpe's note I deposited to the credit of my brother. I kept but one bank account; it was in the bank of Wilmington and Brandywine; my father is president of it. Sometimes my father discounts paper for me and gives me the money, and sometimes he gives me a check. I drew the money out of the same bank to discount Parker's notes

with. My brother first came into the store in 1836. He lived in Philadelphia till that year; went down in September, 1836. The store is carried on by me up to this day under that power of attorney. The sale to Mr. Sharpe was a *bona fide* sale—no cover of any kind whatever. The money with which the fifteen shares were bought in my name was taken out of my brother's stock, and the proceeds returned. I never had any interest in that stock whatever, although it was in my name."

The counsel for the defendants then called the subscribing witnesses, to the power of attorney, which was read in evidence, as follows:

"Know all men by these presents, that I, the undersigned, for value received, do hereby irrevocably constitute and appoint Jesse Sharpe, to be my true and lawful attorney, for me, and in my name and behalf to sell, assign and transfer unto Samuel Parker, or any other person or persons, fifteen shares in the capital stock of the Bank of the United States, and further one or more persons under him to substitute, with like power.

In witness whereof, I have hereunto set my hand and seal, this 22d day of April, 1836."

The counsel for the defendants further gave in evidence a notice, dated the 13th of May, 1836, to the president and directors of the Bank of the United States, by the attorneys of Mr. Sharpe, that the stock attached as the property of Mr. Seal was actually the property of Mr. Sharpe.

The counsel for the defendants further gave in evidence the following order:

" Mr. Samuel Parker,
	Sir,
You will please to pay Joshua T. Seal, the proceeds of the fifteen shares of the United States Bank stock you sold of mine, and much oblige,

	Yours,

	JESSE SHARPE.

Wilmington, May 22d, 1837."

The evidence having been gone through, and the jury having been addressed by counsel on both sides, as the judge was about to charge the jury, the plaintiff's counsel handed him the following points in writing:

" 1. That if the brother of Joshua T. Seal entrusted him with money to conduct and carry on a store with, and gave him the absolute control of funds for a number of years, and he (Joshua T. Seal) purchased stock in his own name, and dealt with it as his

VOL. VI.—17

(Commonwealth *v.* Watmough.)

own, such stock in the possession of Joshua T. Seal would be liable to his creditors.

2. That if the jury believe that these fifteen shares of stock never were transferred to Jesse Sharpe, but were in the name of Joshua T. Seal till they were transferred into the name of Samuel Parker, then and in that case, they were liable to this execution.

3. That if this stock never was in the name of Jesse Sharpe, and he never had the possession of it, except for the purpose of transferring it to Samuel Parker, but it continued in the name and possession of Joshua T. Seal, at the time of the levy, that then and in that case it was liable to this execution.

4. That the sheriff was bound to proceed and sell this stock standing in the name of Joshua T. Seal, especially as an indemnity was offered to him by the plaintiffs."

The learned judge charged the jury, in substance, as follows:

" The plaintiff alleges that there was property of J. T. Seal sufficient to make the money, on which the sheriff actually levied, and that by his subsequent return of *nulla bona*, he made himself and his sureties liable for the debt. It is conceded that if there was such property, the defendants are liable; and the question is, was there such property or not? The defendants say, that after the levy and before the return, the sheriff was satisfied that the property levied on, did not belong to J. T. Seal. On the 18th of April, 1836, fifteen shares of the United States bank stock were transferred on the books of the bank to Joshua T. Seal. At that time the present plaintiffs had the judgment against Seal. The second section of the act of the 29th of March, 1819, relative to taking stock in execution, authorised a levy on the stock in the name of J. T. Seal, if it were *owned* by him. The distinction between *ownership* and *holding for another*, is plainly and unequivocally recognised in the preamble to the third section of the act, and in the third section, and provision is made to enable a creditor of a person owning stock held in another's name, to reach it for the debt of the real owner. On the 6th of May, execution being issued, a levy on this stock was made, it still standing on the books in the name of J. T. Seal. So far the plaintiff has a *prima facie* case. Until explained the name of J. T. Seal on the books of the bank might be deemed sufficient evidence of his ownership. The defendants, however, make a two-fold defence.

1. They allege that though the stock was in the name of Joshua T. Seal, yet in fact it was *owned* by his brother Joseph; that Joshua never had any interest in it. If this be made out in point of fact, it finishes the controversy. The sheriff was *then*, right in returning *nulla bona*, and any judgment creditor of Joseph Seal, if such ex-

(Commonwealth v. Watmough.)

isted, could have made it liable to execution, for debts due ·by *him.* The defendants rely on the testimony of Joshua T. Seal, who certainly swears unequivocally to the fact that he had no interest; that the stock was bought with his *brother's money*, and was owned entirely by *him.* The defendants say that Joshua was a man of no property, merely an agent for his brother, and that the brother was a man of substance. All this depends on the evidence of Joshua himself. The plaintiffs ask you to reject the testimony as that of a man unworthy of belief. The plaintiffs produce no witnesses to contradict, but argue on the facts and papers in evidence, that there is enough to show him not entitled to be believed. The plaintiffs say that the story is improbable in itself, that no adequate reason is given for using the witness's name for his brother, but the reverse, and that the manner in which the witness testified, shows his disregard of truth. The defendants deny these inferences, and contend that as an unimpeached witness he is entitled to full credit; that there is nothing in his statement improbable or inconsistent, but on the contrary every thing is natural and obvious, and that there is nothing in his manner to bring discredit on him. The jury will judge. If the jury are with the defendants on this part of the case, there is nothing left. But the defendants say further; that even if Joshua was the owner, yet there was such a divesting of his ownership before the levy, as to prevent the execution from attaching. A certain paper is produced. The defendants allege that on the 22d day of April, 1836, some days before the levy or before the execution was handed to the sheriff, J. T. Seal sold the stock to Jesse Sharpe, took full value for it in Mr. Sharpe's note at sixty days, (which was paid at maturity) and handed him over the certificate, with a power of attorney irrevocable to transfer the stock on the books of the bank. All this he did, it is said, for his brother, though his name was necessarily used. If Mr. Sharpe had immediately made the transfer, (supposing the 22d of April, 1836, to be the date of the transaction,) it would have prevented all dispute ; but he retained the certificate and power of attorney until the levy was actually made, and then, for the first time, informed the bank of his claim. In the case of goods and chattels, the rule is clear, that where there is a judgment against any one, a transfer of the property, unaccompanied by actual possession, is void against the creditor ; and even where possession does accompany the transfer, the party is required to show, as against a creditor, beyond doubt, that there was a sufficient consideration. The peculiar character of *bank stock*, however, renders it necessary to guard against being mislead by this general rule of law. In reference to a transfer of interest, it is more analogous perhaps to a chose in action than to goods and chattels. The discrimination is marked in the very section of the act of 1819, on which the plaintiff relies, to sustain his levy. That section declares that " Stock, &c. shall be liable to be taken into execution, and sold in the same man-

(Commonwealth v. Watmough.)

ner that goods and chattels are liable in law to be so taken and sold," not in the same manner that *other* goods and chattels are liable, &c. but goods and chattels. The subject was considered by the Supreme Court, in the case of the *United States* v. *Vaughan,* (3 *Binney,* 394,) in reference to stock situated at this is. There by the charter of the bank, as here by an act of assembly, transfers are directed to be made in the presence of an officer of the bank. It was held that stock, assigned *bona fide,* for full value, on the certificate, and handed over with a power of attorney to transfer, conveyed such an interest that the stock was not liable afterwards to attachment as the property of the vendor, although the transfer was not made on the books of the bank at the time of attachment. Judge BRECK-ENRIDGE intimates that the principle must go the whole length of protecting the stock from levy under an execution against the vendor. In the *United States* v. *Cutts,* (1 *Sumner,* 133,) the principle of the above decision is approved and enforced by Mr. Justice STORY. Whether in case of a second sale of the same stock to an innocent purchaser, for full consideration, and an actual transfer on the books of the bank, the first vendee would not be made to suffer for his own omission to consummate his title, is not the question here. As he left it in the power of the vendor to commit such a fraud upon him, he would hardly be allowed to complain, except against the vendor. I hold it then to be the law, that if on the 22d of April, 1836, Mr. Sharpe actually gave value for the stock, in good faith, and took an assignment and power to transfer, it authorises him to make defence in this suit. The handing over the certificate with an irrevocable power of attorney to transfer, was a sufficient assignment to pass all Mr. Joshua T. Seal's interest in the stock. This being the law, the plaintiffs again meet the case in point of fact. They say, the transaction did not occur on the 22d of April, 1836, but after the levy, and that the whole of it was a fraudulent effort to convey stock really owned by J. T. Seal. To make good their position, they must here also, deny that Mr. Seal speaks the truth, and indeed must charge him with a series of unequivocal falsehoods. The plaintiffs give their reasons for the allegations. The defendants deny that there is the slightest ground for these accusations. The jury must determine. Both grounds of defence are made out if J. T. Seal speaks the truth. If he is false in regard to the one ground, it is not unlikely that he is in regard to the other. So that the whole case seems to be resolved into a question, whether the jury believe him to have spoken the truth, or to have uttered gross and palpable falsehoods."

The jury found for the defendants; and the plaintiffs' counsel having excepted to the charge, a writ of error was taken, and the following errors assigned.

" 1. The court erred in admitting Joshua T. Seal as a witness, as mentioned in the plaintiffs' first bill of exceptions.

2. The court erred in refusing to strike out the testimony of Joshua T. Seal, when his interest was disclosed; and in admitting his testimony, as mentioned in the plaintiffs' same bill of exceptions.

3. The court erred in admitting the testimony of Joshua T. Seal, as mentioned in the third bill of exceptions.

4. The court erred in not instructing the jury as requested in the plaintiffs' first point; but on the contrary, instructing them, that if Joshua T. Seal purchased the stock with the money of his brother, that then it was not his, nor liable to his creditors.

5. The court erred in not instructing the jury as requested in the plaintiffs' second and third propositions; but on the contrary, instructing them, that if the stock was sold by Joshua T. Seal to Jesse Sharpe, on the 22d April, 1836, and the certificate delivered to him, with an irrevocable power of attorney, although never transferred to Sharpe on the books of the bank, yet that it was his, (Sharpe's) and not liable to be levied upon, by an execution against Joshua T. Seal.

6. The court erred in not instructing the jury as requested in the plaintiffs' fourth proposition; but on the contrary, instructing them, if they believed that the stock in question was purchased by Joshua T. Seal with the money of his brother, or that it was sold to Sharpe, although never transferred into his name, the sheriff was justified in returning the *fi. fa.* "*nulla bona,*" though the plaintiffs offered to indemnify him."

Mr. *Perkins,* for the plaintiffs in error.

The three first errors assigned all relate to the admission of Joshua T. Seal as a witness, to prove that the stock levied on was the property of Jesse Sharpe: that he had sold it to Sharpe.

A sale of personal property implies a warranty of title on the part of the vendor. *Ritchie* v. *Summers,* (3 *Yeates,* 534.)   *Boyd* v. *Bopst,* (2 *Dall.* 91.)   *Shields* v. *Buchanan,* (2 *Yeates,* 219.)   Seal, the vendor, was offered to support the title to the stock, in Sharpe, his vendee.   If Sharpe, the vendee of Seal, lost the stock from defect of title in Seal, he would have a right of action against Seal, his vendor. In such action the verdict in this case would be evidence.   *Witmer et al.* v. *Schlatter,* (2 *Rawle,* 365-6.)   *Leather* v. *Poultney,* (4 *Binn.* 356.)   *Clarke's Executors* v. *Carrington,* (7 *Cranch,* 322.)   *Waldo* v. *Long,* (7 *Johns.* 173.)—*Blasdale* v. *Babcock,* (1 *Johns.* 517,) was an action on the case on an implied warranty of title in the sale of a horse, which the plaintiff had purchased of the defendant, and which one Snow had recovered from him in an action of trover; and the record of the recovery by Snow was held to be evidence. *Bar-*

*ney* v. *Dervey,* (13 *Johns.* 224.)   In an action by Sharpe against Seal the averment that Seal was examined as a witness in this case would be tantamount to an averment that he had notice: and all the cases, show, that if Seal had notice, the verdict and judgment in this case would be conclusive against him, in an action by Sharpe, on an implied warranty of title to the stock. *Kip* v. *Brigham,* (6 *Johns.* 158.)   *Pinney* v. *Gleason,* (5 *Wend.* 535.)   *Tarlton* v. *Tarlton,* (4 *Maule & Sel.* 20.)   A vendor of goods is not a competent witness for the vendee in an action by a third person for the goods. *Heermance* v. *Vernoy,* (6 *Johns.* 5.)   *Chapman* v. *Andrews,* (3 *Wend.* 240.)   *Baxter* v. *Graham,* (5 *Watts,* 418.)   If this verdict could be given in evidence in an action by Sharpe against Seal, the witness, he was incompetent. *Conrad et al.* v. *Keyser,* (5 *Serg. & Rawle,* 371.) *Hilhouse* v. *Smith,* (5 *Day,* 432.)   *Benjamin* v. *Smith,* (12 *Wend.* 404. 406, 7.)   It is not even necessary, in order to render a witness incompetent, that the record in the pending cause should be evidence, for or against him in a subsequent suit.   It is enough that a decision of the cause in favour of the party calling him, will prevent the witness's liability to a subsequent suit; 6 *Page's Ch. Rep.* 81, and cases there cited.   By the verdict and judgment in this case Sharpe keeps the stock; and this judgment prevents a suit by him against Seal, the witness, on an implied warranty of title.   The release by Parker to Seal did not restore his competency.   He was liable to Sharpe, not to Parker; and Sharpe never released.   The delivery of the certificate of the stock by Seal to Sharpe, accompanied with an irrevocable power of attorney, did not exempt it from being levied on and sold as Seal's property, if Sharpe suffered it to stand in Seal's name, on the books of the bank.   The law is well settled in Pennsylvania, that possession must accompany the sale of personal property. *Clow* v. *Wood,* (5 *Serg. & Rawle,* 275.)   *Cunningham* v. *Neville,* (10 *Serg. & Rawle,* 201.)   *Shaw* v. *Levy,* (17 *Serg. & Rawle,* 99.)   *Pritchett* v. *Jones,* (4 *Rawle,* 260.)   *Jenkins* v. *Eichelberger,* (4 *Watts,* 121.)   In this case the stock had been standing on the books of the bank, in the name of Joshua T. Seal, from the 18th of April, 1836.   It was levied on as his property on the 6th of May, 1836; and was not transferred on the books of the bank till the 1st of June, 1836; and then, not to Sharpe, the alleged purchaser, but to Mr. Parker.   The stock never was in the name of Jesse Sharpe, the claimant.   Is there any thing in the character of bank stock that should exempt it from the wholesome rule established in regard to other personal property?   It is as susceptible of delivery, and much more, than many descriptions of property to which this rule has been held to apply.   The act of assembly treats it as personal property. *Purd. Dig.* edit. 1830, p. 167. sec. 2. Act. 29th, March, 1819.  And the Act of 18th June, 1836. sec. 22, (*Purd. Dig.* 5th edit. 370,) says, that it shall be liable to execution like other goods: and section 34 of the same act (*Purd. Dig.* 371;) points out

the course for a claimant of stock, standing in the name of the defendant, to pursue to try his rights. The transfer of stock is not good, till made according to law on the books of the company. *Marlborough Manufacturing Co.* v. *Smith*, (2 *Conn. Rep.* 579.) *Newton* v. *Bridgeport Turnpike Co.*, (3 *Conn. Rep.* 544.) *Northrop* v. *Curtis*, (5 *Conn. Rep.* 246.) *Oxford Turnpike Co.* v. *Bonnell*, (6 *Conn. Rep.* 552.) The act of 1st April, 1836, sec. 3, requires the stock of banks to be assigned and transferred in the presence of the president, cashier, or other officer appointed by the directors. The sheriff was bound to execute the writ and sell the stock when a satisfactory indemnity was offered. *Baily* v. *Bates*, (8 *Johns.* 143.) *Vancleef* v. *Fleet*, (15 *Johns.* 167.) *Curtis* v. *Patterson*, (8 *Cowen*, 67.) *Mayne* v. *Seymor*, (5 *Wend.* 309.)

Mr. *M'Call*, for the defendant in error, having cited *The U. S.* v. *Vaughan*, (3 *Binn.* 394.) *The U. S.* v. *Cutts*, (1 *Sumner*, 133.) *Bank of Utica* v. *Smalley*, (2 *Cowen*, 770.) *Quiner* v. *Marblehead*, (10 *Mass Rep.* 476.) *Plymouth Bank* v. *Bank of Norfolk*, (10 *Pickering*, 454,) was stopped by the court; whose opinion was delivered by

KENNEDY, J.—The only question involved in the first three errors assigned, which seems to be worthy of notice, is the competency of Joshua T. Seal as a witness for the defendants. If the competency of the evidence, or any portion thereof, was intended to be excepted to, I think it was not made a question of, and pressed on the argument of the cause here; nor can I perceive any tenable ground upon which such an exception could have been sustained.

The objection to the competency of Joshua T. Seal, as a witness for the defendants, is made upon two grounds; First, that of interest in the event of the suit; and second, that of the verdict in this case, if it had been in favour of the plaintiff, being evidence in an action brought hereafter by Jesse Sharpe against Seal, to recover back the price of the stock, upon a breach of the implied warranty of title, on the part of Seal, that attended the sale thereof by him to Sharpe. Sharpe, it would seem, must be considered the real defendant in this suit, though Seal undoubtedly was interested in it, according to his own statement, until he was released by Parker, which was on the trial of the cause: because he induced Parker to go into a bond with Sharpe to the sheriff, engaging to save the latter harmless, if he would forbear to proceed on the execution which he had in his hands at the suit of the plaintiffs against Seal, to sell the stock. But Seal could only be looked on as interested in the event of the suit, on account of his undertaking to Parker, to be back security to him, for the sufficiency of Sharpe to keep him indemnified, for becoming Sharpe's security in the bond given by them to the sheriff. But it is alleged that Seal, in selling the stock, as the owner thereof, to

(Commonwealth *v.* Watmough.)

Sharpe, impliedly warranted the title of it; that a recovery by the plaintiffs in this action, would be evidence, at least, of a breach of such warranty; and Seal by means thereof might be rendered liable to return the price of the stock to Sharpe: hence it is contended that he was interested in preventing a recovery by the plaintiffs, and therefore not competent to give testimony against them; which was in effect giving evidence in his own favour. Now admitting that Seal, by selling the stock to Sharpe, thereby agreed to warrant and support the title to the stock, it by no means follows that a recovery by the plaintiffs in this action would be any evidence whatever of the breach of such warranty: on the contrary, I think it very clear that it would not. For the plaintiffs, by claiming to recover in this action, do not dispute or deny the right of Seal to the stock, so far from this, they assert that he was the owner of it, at the time that Sharp alleges he bought it of Seal, and even afterwards as late as the 8th of May, 1836, when the execution of the plaintiffs was first put into the hands of the sheriff. But Sharpe claims to have purchased the stock from Seal on the 22d of April, 1836, several days before the execution against Seal was issued; so that the recovery by the plaintiffs in this action could not possibly affect the implied warranty of title to the stock, by Seal to Sharpe. Consequently, in this point of view, Seal could not be considered as being called to support his own interest by his testimony. But it is further contended by the counsel for the plaintiffs, that a verdict of recovery, by the plaintiffs in this action, would be evidence in an action brought afterwards by Sharpe against Seal, to recover an indemnity or compensation for the loss occasioned thereby to him by means of his having bound himself to indemnify and save harmless the sheriff. It has not been shown, I think, that such a verdict could be made evidence in such case upon any correct principle. From any thing that was disclosed on the trial, it has not been shown that any such action could be maintained by Sharpe against Seal. The only ground alleged for it is, that in the event of a recovery here by the plaintiffs, there would be a breach of the implied warranty of title to the stock given by Seal to Sharpe. But the incorrectness of this proposition has been shown already above. It might, however, be further illustrated by supposing a recovery had by the plaintiffs in this action, and a suit brought in consequence of such recovery by Sharpe against Seal. Sharpe, in order to maintain his action, would, on the trial of it, have to prove his purchase of the stock from Seal. This would have to be his first step; and this he could only do by giving in evidence either the admissions of Seal, or by showing the fact otherwise, in connexion with the letter of attorney from Seal to him, showing that he effected the purchase as early as the 22d of April, 1836. Then, after having thus shown his purchase to be at least as early as that date, how could a recovery against the sheriff for not having taken the stock in execution afterwards, on the 6th

of May, 1836, as the property of Seal, be made evidence upon any principle to support his claim? Most clearly, it could not; because it is perfectly obvious, if Sharpe bought the stock of Seal on the 22d of April, 1836, that the sheriff could not have been made liable for not taking it in execution afterwards, on the 6th of the following month, as the property of Seal, unless during the interim Seal had repurchased, or by some means become the owner of it again; or that the sale between Seal and Sharpe was collusive and fraudulent; in either of which cases Sharpe would not be entitled to recover; and therefore the recovery in this action by the plaintiffs would be unavailing to him; and upon that ground alone, if upon no other, would be inadmissible as evidence. But if Seal had any real interest in the event of this suit, it would rather seem to have been such as might have inclined him in favour of a recovery by the plaintiffs; because they by such a recovery would have had their judgment against Seal satisfied; and thus Seal, perhaps, might become relieved from all further proceeding upon it against him. But since the plaintiff's have failed to recover, he of course still remains liable, and may expect to be compelled, if ever able, to pay it. We therefore think that the release from Parker to Seal, removed all objection to his competency as a witness for the defendants.

The three remaining errors are exceptions to the charge of the court to the jury. On the trial of the cause the counsel for the plaintiffs asserted, that the legal title to the stock being vested in the name of Joshua T. Seal, though in reality purchased for the use of his brother Joseph, with the funds of the latter, made it properly liable to be taken in execution, and sold for the debts of Joshua. The court, however, in answer to this proposition, instructed the jury, that unless the stock was *owned* by Joshua, it could not be taken in execution and sold for his debts: that if in point of fact it was made out, that his brother Joseph was the *owner* of it, that finished the controversy. The fourth error is an exception to this instruction of the court. It is proper to premise first, that at common law such stock could not have been taken in execution; and that in this case, when the sheriff had the execution put into his hands against Joshua T. Seal, it was only authorised by the act of the 29th of March, 1819; *Purd. Dig.* 99, (1831,) 7 *Smith's L.* 217. But by the provisions of this act, it is plain that such stock is only made liable to be taken in execution for the debts of the *real* owners thereof. Where the stock stands on the books of the corporation, in the name of the *real owner*, it may be taken in execution and sold, upon a judgment had against him, in the same manner that goods and chattels are liable to be so taken and sold: but, when held in the name of *another*, process in the nature of a foreign attachment is required to be first issued against the stock, and the person in whose name it shall be so held, be summoned as a garnishee, after which the like proceeding thereon is directed to be had as in the case of a

foreign attachment. That such stock should be liable for the payment of the debts of its real owner, is perfectly just and equitable; but that it should be held liable to the payment of the debts also of the person in whose name it is holden would certainly be very unjust; and what, I apprehend, the legislature never intended. We therefore think that the instruction of the court to the jury on this point was correct.

The counsel for the plaintiffs, on the trial, further claimed, that if the stock was suffered to remain on the books of the bank, in the name of Joshua T. Seal until after the execution came into the hands of the sheriff, it was liable to, and ought to have been taken in execution by him as the property of Joshua T. Seal, notwithstanding the latter might have actually sold it previously thereto. The court, as to this, after stating that in the *United States* v. *Vaughan,* (3 *Binn.* 394,) it was held that stock, assigned *bona fide,* for full value, on the certificate, and handed over with a power to transfer, conveyed such an interest that the stock was not liable afterwards to attachment as the property of the vendor, although the transfer was not made on the books of the bank at the time of the attachment, then told the jury, "that if on the 22d of April, 1836, Mr. Sharpe actually gave value for the stock, in good faith, and took an assignment and power to transfer, it authorised him to make defence to this suit." The counsel for the plaintiffs alleges that in this direction to the jury the court erred. And in order to support this allegation, it is argued that the same rule, which is requisite to make a transfer of ordinary goods and chattels valid against execution-creditors, ought to be observed and applied so far as practicable, in the transfer of stock: that to render a transfer of goods valid against the claims of the creditors of the vendor, a transmutation of the possession must accompany the transfer; but as this is not altogether practicable in the case of bank stock, on account of its not being susceptible of manual occupation or possession, yet if it will admit of any thing being done, which can fairly be considered equivalent to an actual change in possession of goods, it ought to be done, otherwise the sale ought to be held invalid, at least, as against the creditors of the vendor : that a transfer of the stock, on the books of the bank, would seem to be the only thing that can be deemed in such a case an equivalent to the vendee's taking the actual possession in the case of goods, and, therefore, unless done, the transfer ought not to avail against creditors. Though this reasoning may be ingenious, and not without plausibility, yet it is believed that it would be contrary to the universal understanding, as also the practice of mankind, on the subject, to adopt it. Besides, although the legislature has made such stock the subject of execution, yet it cannot be said that the nature of it has been thereby changed, so as to have become in every respect the same or even similar to goods and chattels. For the debts of the *real* owner it is made liable to be

taken in execution; but as to what constitutes the *ownership* of it, or the nature of the evidence, by which it may be established, they are in nowise changed. The law in that respect remains the same as it was before the passage of the act subjecting it to execution. The actual possession and use of goods is a matter which is open and visible to all the world, and being also considered *prima facie* evidence of ownership, it has therefore not only in law, but likewise in the common estimation of mankind, been supposed to be sufficient to give such possessor a credit in his dealings and intercourse with the world equal to the value of the goods so held and used; and for this reason it has been held that a private purchaser of goods, even for a valuable consideration, who leaves them in the possession of the vendor, no matter from what motive, whether innocent or fraudulent, shall not be permitted afterwards to withdraw them from the execution-creditor of the vendor. But as to the stock, it, from its very nature, is incapable of such possession so as to make it known or notorious who has the use or benefit of it, and thus raise a general belief in regard to the ownership thereof: even its existence may be unknown, excepting comparatively to but few persons. The only evidence of it that can be safely trusted as to this, is the books of the bank or the corporation; but they being of a private nature are not open to public inspection. Hence it is, that the ownership of such stock though held by the owner in his own name on the books of the corporation, is not supposed to have given him a general credit with the world. And for the same reason, if held by another in trust for him, the trustee is never supposed, by reason of its standing in his name on the books of the corporation, to have obtained a general credit on account of it. It is not, therefore, to apprise the world and prevent it from giving a false credit to the apparent owner of stock that the transfer thereof is required to be made on the books of the bank in the presence of one of its officers. The great object of requiring transfers to be made in this manner, is, to prevent all difficulty that otherwise might arise with those who have the direction and management of the bank, in ascertaining the persons who are to be regarded and treated by them as the owners of the stock and as corporators. No persons, therefore, are to be regarded by them as such, excepting those in whose names the stock is entered and holden. It is, therefore, only by means of an assignment made of the stock on the books of the bank, in the presence of a proper officer thereof, that the assignee can claim to exercise the rights of a corporator, and to be recognised by the bank as such. But the act of assembly, under which the bank was incorporated, does not, nor yet does any other act, make void or invalidate assignments of the stock made in a different manner. Although they may not invest the assignee with the legal title to it, yet he will be considered in equity as the real owner thereof, and must be treated as such, when known, by all the world, excepting the bank, which,

for certain purposes, may refuse to do so.   We, therefore, consider the instruction given by the court, on this point, to the jury, correct.

A third proposition was advanced by the counsel for the plaintiffs on the trial; "that as they offered to indemnify the sheriff, he was bound to proceed and sell the stock, whether Joshua T. Seal was the owner of it or not." The court, however, denied the correctness of this proposition, and instructed the jury that if Joshua T. Seal was not the owner of the stock at the time the execution came into the hands of the sheriff, the sheriff was not bound to proceed and sell it. This instruction of the court is made the subject of the last error assigned.   It would certainly have been a most palpable error in the court, if it had affirmed the proposition advanced by the plaintiffs' counsel on this point.   It would, in effect, have been declaring, that it was the duty of the sheriff to do an illegal act, because the plaintiffs had offered to indemnify him if he did so.   For surely it cannot be seriously alleged that it would not be an illegal act, and a most glaring violation of law, in a sheriff to seize and sell, knowingly, the property of a stranger or third person, under an execution, who was nowise liable for the payment of the debt or money thereby directed to be levied : yet it is evident that the sheriff would have done this very thing if he had proceeded and sold the stock in question, when it, in fact, belonged to Jesse Sharpe and not to Joshua T. Seal, the defendant in the execution.   The sheriff, it is true, is bound to take property, when pointed out to him by the plaintiff in the execution as belonging to the defendant, if it be his in fact, though it may be doubtful at the time whether it is so or not; if the plaintiff offers to indemnify him.   And if he should refuse in such case, after an indemnity offered, to proceed against the property under an execution, and the plaintiff, in a suit brought against the sheriff for not having so proceeded, should show clearly that the defendant in the execution was the owner of it at the time, the plaintiff would be entitled to recover ; but not otherwise.   So that the sheriff, if he refuses to take and sell the property, after being offered an indemnity by the plaintiff, takes the risk and responsibility upon himself of showing, if sued afterwards by the plaintiff, that the property did not belong to the defendant named in the execution; and this is the most that can be claimed of him.   The judgment is affirmed.

Judgment affirmed.