# Wood's Appeal.

## Wood *versus* Smith.

1. One who has conferred upon another, by a written transfer, all the indicia of ownership of property, is estopped to assert title to it as against a third person who has in good faith purchased it for value from the apparent owner.

2. A certificate of stock accompanied by an irrevocable power of attorney, either filled up or in blank, is in the hands of a third party presumptive evidence of ownership in the holder.

3. One of four executors placed in the hands of his brokers certain certificates of stock which belonged to the estate of his testator. These certificates were pledged as collateral security for the personal indebtedness of this individual executor, and were accompanied by a blank bill of sale and a power of attorney signed by him as acting executor. The brokers in turn pledged the stock to one who advanced money to them in the belief that the brokers were the real owners of the stock. The remaining executors filed a bill in equity to recover the stock. *Held,* that the same principle which prevails in the case of an absolute owner applies in the case of an executor who invests the holder of certificates of stocks with apparent ownership, and that there could be no recovery of the stock until the advances made thereon were paid.

4. The fact that the legal title to the stock was known to have previously been in the executor, and that the title of the holder appeared on its face to have been derived from him in his representative capacity, does not raise a suspicion or put a purchaser on inquiry, for the reason that it is the executor's primary duty to dispose of the assets and settle the estate.

5. The law casts no duty upon a purchaser to ascertain if the trusted executor of a decedent's will is mismanaging the estate in fraud of creditors or legatees.

January 4th 1880. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY and STERRETT, JJ. GREEN, J., absent.

Appeal from the Court of Common Pleas, No. 4, of *Philadelphia county* : Of January Term 1878, No. 72. In Equity.

[Wood's Appeal.]

Bill in equity filed by R. Francis Wood, Charles Stewart Wurts and John B. Packard, executors of the will of Charles S. Wood, deceased, against George R. Wood, James J. McDowell, Joseph R. Wilkins, Jr., The Cambria Iron Company and D. C. Wharton Smith.

The object and purposes of the bill were to compel the restoration and delivery to the plaintiffs, as executors of the will of Charles S. Wood, deceased, of certain certificates of shares of stock in the Cambria Iron Company, which, at the time of the filing of the bill, stood in the name of Charles S. Wood, their testator; and were in the possession of D. C. Wharton Smith, one of the defendants.

The case was referred to an examiner to take testimony, and upon the filing of his report was referred to Peter McCall, Esq., as master, who, inter alia, found the following facts:

"Charles S. Wood, of Philadelphia, died on the twenty-seventh day of May 1873, leaving a last will, of which he appointed his sons, George R. and Richard Francis Wood, and his sons-in-law, Dr. John H. Packard and Dr. Charles Stewart Wurts, the executors. All the executors proved the will and took letters testamentary.

"Mr. Wood, at the time of his death, was the owner of 20,385 shares of the stock of the Cambria Iron Company, of which company he was president, the certificates of which stood in his name.

"There was no understanding among the executors that any of the functions of the other executors should be transferred or delegated to George R. Wood, although there was a general understanding that he and R. Francis Wood should pay bills, collect income and keep an account. The estate kept a separate bank account in the Western National Bank, on which George R. Wood drew checks, with the knowledge of his co-executors, as acting executor. Some checks were also drawn by R. Francis Wood, whose signature and that of George R. Wood were given to the bank as of those qualified to draw.

"At the time of Mr. Wood's decease and afterwards, the certificates of the Cambria Iron Company stock were kept in a box in the fire-proof of that company. The key of this fire-proof was kept in the office by a clerk of the company, and George R. Wood, who was in the employ of the companies owned by the Cambria Iron Company, and had a desk in one of the suite of rooms in which was the office of that company, had free access to the fire-proof.

"The key of the box containing the certificates of stock belonging to his father's estate was kept by him, and he had free access by himself, uncontrolled by the other executors, to the certificates.

"The other executors were not in the habit of going to the box

in which the securities were kept. No precautions were taken by them to prevent George R. Wood from disposing of any of the securities. But there was a distinct understanding among all the executors before leaving town for the summer of 1873, that there should be no sales until the autumn. .

"In that summer, without the knowledge of his co-executors, George R. Wood speculated in Lehigh Navigation and Pennsylvania Railroad stocks, through the medium of MacDowell & Wilkins, stock brokers on Third street, who carried for him large amounts of these stocks, being protected by margins of stocks deposited with them as collateral security by George R. Wood.

"Among these securities were certificates of seven thousand two hundred and seventy-six shares of stock of the Cambria Iron Company, belonging to the estate of Charles S. Wood, which were abstracted by George R. Wood from the fire-proof without the knowledge of his co-executors. Each of these certificates stood in the name of Charles S. Wood, and was accompanied by a blank bill of sale and power of attorney to sell and transfer, signed 'George R. Wood, acting executor.'

"Two of these certificates, for one thousand and thousand one one hundred and seventy-two shares respectively, were used by MacDowell & Wilkins in certain transactions with the defendant, D. C. Wharton Smith, carrying on the business of broker and banker which have given rise to the present controversy. Those transactions were as follows.

"On the 20th September 1873, the defendant sold to MacDowell & Wilkins, two hundred shares of Lehigh Navigation stock at $30 per share, deliverable in sixty days. On the 2d October following, he sold to them six hundred shares of the same stock at $27 per share, deliverable in thirty days; and on the sixth of the same month, he sold to them two hundred more shares of that stock at $29.50 per share, deliverable in thirty days. The defendant called upon them for a margin, as the market declined during the Jay Cooke panic, and received from them certificate No. 110, of one thousand shares of stock of the Cambria Iron Company, belonging to the estate of Charles S. Wood. MacDowell & Wilkins failing to take the stock when their contracts fell due, the stocks were sold out on their account.

"Besides these stock transactions, MacDowell & Wilkins, on the 29th September 1873, borrowed from the defendant $12,000 on call, giving him their due-bill for that amount and certificate No. 638, for one thousand one hundred and seventy-two shares of stock of the Cambria Iron Company, belonging to the estate of Charles S. Wood, as collateral.

"Attached to each of these certificates was a blank bill of sale and power of attorney, under seal, signed 'George R. Wood, acting executor,' in the words following:

[Wood's Appeal.]

" Know all Men by these Presents, that          for value received, have bargained, sold, assigned and transferred, and by these presents do bargain, sell, assign and transfer unto                    shares of the capital stock of the                    standing in                    name on the books of the                    and do hereby constitute and appoint                    true and lawful attorney, irrevocable for                    and in                    name and stead ; but to use, to sell, assign and transfer, and set over, all or any part of the said stock, and for that purpose to make and execute all necessary acts of assignment and transfer, and one or more persons to substitute with like full power, hereby and confirming all that said attorney or                    substitute or substitutes shall lawfully do by virtue hereof.

" *In witness whereof*,          have hereunto set          hand and seal, the          day of          1873.

          " George R. Wood, [seal.]
                    " Acting Executor.

" Sealed and delivered in the presence of

" The bill of sale and power attached to the certificate No. 110, of one thousand shares, as surrendered to the plaintiffs, has the number of shares of Cambria Iron stock, and number of the certificate and date (16th September) filled in the blanks, in the handwriting of Mr. MacDowell, and is witnessed by him. The other has the name Charles S. Wood, the number of shares (1172), the name of the company, the number of the certificate 638, and the date 22d September filled in the blanks, in whose handwriting did not appear, and is witnessed by Mr. Wilkins, the other member of the firm.

" The defendant in his answer declares, that in dealing with MacDowell & Wilkins in these transactions, he believed the stock to have been sold to them, and that he received the certificates in perfect good faith. In his examination he testified, that he dealt with them as principals, not as agents ; and that he had no doubt, or reason to doubt, that the certificates were their property when he received them. He received them from Wilkins, but made no inquiry as to how they became possessed of the stock.

" No money has come into Charles S. Wood's estate by reason of these transactions, nor has it derived any benefit therefrom.

" The plaintiffs' bill was filed October 16th 1873, and an injunction was granted by the court, restraining the defendant from selling, &c., the certificates. From this decree an appeal was taken to the Supreme Court.

" On the 8th of April 1874, the plaintiffs filed an amendment to their bill, praying that if the special injunction theretofore awarded should be dissolved before final decree, they might redeem

[Wood's Appeal.]

the certificates, by paying to the defendant the amount of the debt or advances claimed to be owing to him by MacDowell & Wilkins.

"Saving their right to have back the moneys so paid, with interest, in substantial accordance with the interlocutory order next mentioned.

"And on the same day the Court of Common Pleas made an order that the defendant, on payment to him by the plaintiffs, out of the assets of the estate, of $17,055.39, the amount of the indebtedness of MacDowell & Wilkins to him, for which he claimed to hold said stock as security, should surrender the certificates for two thousand one hundred and seventy-two shares of the Cambria Iron Company stock; such payment and delivery in nowise to prejudice whatever rights the plaintiffs might have to enforce restitution of the moneys so paid with interest, if it should be finally decided that the defendant had no right to hold the certificates as against the plaintiffs, for the debts for which he claimed to have taken the same in pledge from MacDowell & Wilkins.

"On the 8th of April 1874, the plaintiffs paid to the defendant $17,055.39, and got back the certificates."

Upon the foregoing facts the master reported, inter alia, as follows:

"I am not aware of any reported decision of our Supreme Court establishing that the giving possession of the certificate, accompanied by blank assignment and power, confers upon the the holder an apparent title to and power of disposition over it, so as to entitle an innocent third person, who has dealt bona fide with the holder on the faith of this apparent ownership and without notice of the claims of the true owner, to protection.

"In other states of the Union and by courts of high authority, it is well settled that such is the effect of the delivery of the certificate with blank assignment and power.

"In New York, Kortright v. Commercial Bank of Buffalo, 20 Wend. 91; Commercial Bank of Buffalo v. Kortright, 22 Id. 348; Fatman v. Lobach, 1 Duer 354; Leavitt v. Fisher, 4 Id. 1; McNeil v. Tenth National Bank, 46 N. Y. 325; Mount Holly Turnpike Co. v. Ferree, 2 C. E. Green (N. J.) 117.

"The principle on which these cases rest, appears to me to be sound, and worthy of adoption by our courts, namely, that where the owner of stock confers on the holder an apparent ownership by delivering to him, not merely the possession of the certificate, but also a blank assignment and power of attorney to transfer, he ought to be precluded from asserting his real ownership as against an innocent third party who has given value for the stock on the faith of such apparent ownership. * * *

"It was strenuously contended that, however it might be in the case of an absolute owner, the doctrine of these cases has no application where the person who executes the bill of sale and power to

transfer is an executor ; that an executor in this state is emphatically a trustee, and it is the duty of a party claiming title through a trustee to inquire and see that the act of the trustee is in the line of his duty.   Otherwise, he takes it at his peril, and is liable to make restoration of the trust property where there has been an attempt to dispose of it in fraud or violation of the trust, and that nothing short of a bona fide sale by the executor and receipt of the purchase-money can divest the trust.

   " But there is an obvious and well-settled distinction between an executor and an ordinary trustee, in this, that there is no presumption of a trustee's right to sell as there is in the case of an executor.   In the former case, as said by Judge Davis, in Duncan *v.* Jaudon, 15 Wall. 165, the property is held for custody, in the latter, for administration.   Or, as Judge STRONG expresses it, in Bayard *v.* The Bank, 2 P. F. Smith 235, ' The primary duty of administrators is to dispose of the personal property, and therewith pay the debts of the intestate, and make distribution among his next of kin.   A sale and transfer of stock by them is, therefore, in the line of their duty.   A trustee of an insolvent debtor would seem to stand on the same footing, and so generally does an executor.   His primary duty is administration.   He is to pay debts and legacies out of the personal estate, and use even specific legacies to pay debts if necessary.   His letters testamentary, therefore, show an apparent right to dispose of the stocks of the testator.'

   " Now, while it is true that the will of Charles S. Wood gives all the residue of his estate, after the payment of debts, funeral expenses and certain bequests, to his executors in trust for the purposes therein mentioned, yet, until the settlement of his estate in the usual course of administration, the executors held the stock in their capacity of executors, and not as trustees, with all the duties and all the powers of executors.

   " The transactions of the defendant with MacDowell & Wilkins, which gave rise to the contention in this case, took place within six months after the decease of Mr. Wood.

   " He had, therefore, a perfect right to infer that the act of George R. Wood was in the line of his duty as executor.   There was nothing on the face of the document to excite suspicion or lead to inquiry.   It was in the usual form.   The names of MacDowell & Wilkins were not filled in the blank as purchasers.   But that fact was not at all inconsistent with their being purchasers, for the evidence shows that it is quite customary for the certificate and blank assignment and power to pass from hand to hand without the blanks being filled.

   " MacDowell & Wilkins were, at the time of these transactions, in good standing, and the defendant had the right to act on the presumption that they had come honestly by the certificates.

[Wood's Appeal.]

" It seems to me that the same principle which prevails in the case of an absolute owner applies in the case of an executor who invests the holder with apparent ownership.

" But are the plaintiffs precluded from asserting their title to the stock which has been abstracted from the estate by the misconduct of their co-executor ?

" It is laid down in the books that co-executors, however numerous, are regarded in law as an individual person, and consequently the acts of any one of them in respect of the administration of the effects are deemed to be the acts of all. The sale or gift of one of several executors is the sale and gift of all : Williams on Executors 811. By statutes 8 and 9 Victoria, the Bank of England may require all the executors who have proved the will to join and concur in any transfer of stock standing in the name of their testator.

" Now, while it may very well be that the plaintiffs could have recovered the certificates from MacDowell & Wilkins, who were parties to the wrongful act of George R. Wood, it seems to me that they have no equity to recover against the defendant, who is a bona fide purchaser, without notice. Where one of several executors, clothed by law with full power to transfer stock without the concurrence of his co-executors, has held a person out to the world as the owner of the stock · by investing him with the *indicia* of ownership, and a third person relying on such apparent ownership and the law which gives that executor power to sell the stock has dealt with the holder as owner, he is, in my opinion, entitled to protection. Indeed, by not requiring the certificates to be transferred into the joint names of all the executors, the plaintiffs put in the power of George R. Wood to hold out MacDowell & Wilkins as owners of the stock. * * *

" Upon the whole, I am of opinion that McDowell & Wilkins, by the delivery to them of the certificates of the Cambria Iron Company stock, accompanied by the blank bills of sale and powers of attorney, acquired an apparent ownership, which justified the defendant in dealing with them as the actual owners.

" That there was nothing to put him on inquiry. He was an innocent purchaser for value, and is entitled to the protection of the court."

The master recommended a decree dismissing the plaintiffs' bill. To this report the plaintiffs filed exceptions before the master, and these not resulting in any change in his opinion, his report and the plaintiffs' exceptions thereto, were filed in the court below ; and having been argued, they were overruled by the court, and a final decree entered in conformity with the recommendation of the master, that the plaintiffs' bill be dismissed. From said decree this appeal was taken.

11 NORRIS—25

[Wood's Appeal.]

*J. B. Townsend*· and *R. C. McMurtrie*, for appellants.—The master's report recognises what most of the cases he cites clearly declare, that certificates of stocks accompanied with such blank transfers as were used here, are not negotiable.   And yet, in spite of this recognition of what the authorities state upon the subject of their non-negotiability, the master reaches a conclusion which cannot be attained, except by attributing to them the very character of negotiability which he has denied them ; for while he yields to the overwhelming proof of the fact, that MacDowell & Wilkins never had any interest in the stock in question, and recognised that their possession and use of them was wrongful, still he finds them as able to invest the appellees, by the mere delivery of these papers, with an interest and right as pledgees, superior to what George R. Wood himself could have given and conferred upon them.

The cases cited and relied on by the master are expressly put on the doctrine of agency, which enables the holder to pass the title of the signer under circumstances which make the assignee a purchaser, not that the papers do, *per se*, pass or confer title.

The authority· and power of the agent is limited to the power that his principal is able to convey to him, through his power of attorney :  Kortright *v.* The Bank, 22 Wend. 360 ; Fatman *v.* Lobach, 1 Duer 361 ; Leavitt *v.* Fisher, 4 Id. 1 ; McNeil *v.* Tenth National Bank, 46 N. Y. 325.

The vice of the argument on the other side is, that they take the authorities which rest the title on agency, apparent and acted upon which gives the title, and then contend that a title passes irrespective of the limited extent of the powers of the signer of the blank. They forget, that a power by an executor to sell and dispose of such property, does not apparently give the holder the right to pledge for his own debt.

Where certificates get out of the owner's possession, without his knowledge or laches, by fraud or otherwise, he does not lose his title thereto, although they may have found their way into the hands of an innocent purchaser :  Biddle ·*v.* Bayard, 1 Harris 150 ; Swan *v.* North British Association Co., 32 Law Jour. Rep. Exc. 273 ; Tyler *v.* Peninsular Railroad Co., 28 Law Jour. Rep. Eq. N. S. 285.

A careful reading ,of the facts and judicial opinions in each of the cases· decided in this country and in England, where owners of stock have lost their title through such papers (where they did not intend that result), will show that a living owner of the stock voluntarily placed the certificates and blank transfers in the hands of a broker or agent ; then, whatever the owner's instructions might be, the broker or agent had an apparently unrestricted power and authority to do in the owner's behalf, whatever he, the owner himself, could do.   And if there was anything done in respect to

the stock beyond the owner's instructions, he would yet be bound by the act of his agent, in favor of a bona fide purchaser or pledgee without notice, and estopped from denying that his agent had not authority to do what had been done.

The master erred in holding, that the same rules apply to these stocks as if they belonged to a living owner, who had signed such blanks and delivered the same and the certificates to MacDowell & Wilkins.

The interest in and power of an executor over his testator's assets and personalty, is very different from that which he has in his own proper securities and property; the latter he holds *in proprio jure;* the former *en autre droit.*

If then, George R. Wood was clothed with no right or title *jure proprio* in these stocks, but held over them the power of sale and disposal which the law confers upon him by virtue of his being one of four qualified executors, and in fact never did sell them, then he could at most delegate to his agents, MacDowell & Wilkins, the power to sell the same on his account to a bona fide purchaser; that was not done. But neither George R. Wood nor his agents (who, of course, were limited by the same limitations which the law puts on his powers if he had executed them in person), could pledge these stocks for money borrowed without placing the pledgee in this position, viz., he must show that the money he advanced actually went to the purposes of the trust; and the burthen rests upon him to do this, or failing it, he will be deemed to have notice of and become a participant in a breach of trust by the executor. Selling his testator's securities and choses in action, is in the ordinary course of administration by an executor of the estate of the decedent. Pledging them for money borrowed, is extraordinary and outside of his course of customary duties. It is not disputed that he may pledge, if necessity for that course be shown and conclusive proof be furnished, that the money raised went to the use of the trust; but without such proof, the inflexible inference drawn by the law is, that the executor was borrowing for his own purposes, and that the lender, by the very transaction itself, is deemed to have knowledge that such was the case: Petrie *v.* Clark, 11 S. & R. 377; Miller *v.* Ege, 8 Barr 352; Garrard *v.* Railroad Co., 5 Casey 154; Lowry *v.* Commercial and Farmers' Bank, 1 Taney's C. C. Decisions 310; Bayard *v.* Farmers' and Mechanics' Bank, 2 P. F. Smith 232; Shaw *v.* Spencer, 100 Mass. 389; Duncan *v.* Joudon, 15 Wallace (U. S. S. C.) 165; Walsh *v.* Stille, 2 Parsons's Eq. Cases (judgment by King, J.) 17; Christmas *v.* Mitchell, 3 Ired. 535; Simons *v.* Southwestern Railway Bank, 2 Am. Law Reg. 546; Dodson *v.* Simpson, 2 Randolph 294; Field *v.* Schiefflin, 7 Johns. Chan. 155; Williamson *v.* Branch Bank, 7 Ala. 906; Williamson *v.* Morton, 2 Maryland Chan. 94; Collinson *v.* Lister, 7 DeGex, M. & G. 634; Cubbidge *v.* Boatright, 1 Russell's

[*Wood's Appeal.*

Chan. Cases 549; Hill *v.* Simpson, 7 Ves. 152; Redfield on Wills, part 2, p. 214; 2 Williams on Ex'rs 824.

The alleged want of notice on the part of the appellees, cannot be recognised in the eye of the law, because 1. The only inscribed owner was the decedent; and the trust inhered in the property itself, and was patent on the face of the papers. 2. If an actual sale by the executor had not preceded or accompanied the delivery by him to the brokers of the papers—of which the appellees took the risk—then they were dealing with George R. Wood through his agents; and notice necessarily came to them, that, if agents and not owners, the brokers could not by the pledging divest the trust.

*Lewis Waln Smith* and *Wm. Henry Rawle*, for appellees.— Upon the death of a testator, his personalty vests in his executors, who have an inherent right to sell and convert the same, being responsible to the distributees for an improper use of this power; and *a fortiori* is this so of illegal investments: Bayard *v.* The Bank, 2 P. F. Smith 235; Perry on Trusts, sect. 809.

One of several executors has the same power over his testator's personalty as all the executors have jointly; and *a fortiori* is this so where to the executor disposing of the estate has been committed the sole disposition thereof: Williams on Ex'rs., sect. 946; Chew's Estate, 2 Pars. Eq. Cas. 153.

Where one, whether an executor or living owner, is legally possessed of stock with power of disposition, and delivers the certificates accompanied by absolute bills of sale and blank powers of attorney to transfer, the prima facie presumption is that the transaction imports a sale, and that all the title of the inscribed owner is vested in the holder: The United States *v.* Vaughan, 3 Binn. 394; Commonwealth *v.* Watmough, 6 Whart. 117; Building Assoc. *v.* Sendmeyer, 14 Wright 67; Finney's Appeal, 9 P. F. Smith 398.

The legal presumption flowing from the possession of a certificate, bill of sale and blank transfer, is that of ownership, and not of agency.

A certificate of stock, accompanied by an irrevocable power of attorney, either filled up or in blank, is, in the hands of a third party, presumptive evidence of ownership in the holder: Prall *v.* Tilt, 1 Stewart (N. J.) 479; Moodie *v.* Bank, 33 Leg. Int. 400; Robinson *v.* Hodgson, 23 P. F. Smith 202; Holbrook *v.* New Jersey Zinc Company, 57 N. Y. 624; Mount Holly Turnpike Company *v.* Ferree, 2 C. E. Green 117.

And the defendant was justified in presuming that the holder was the owner of the shares, and had a perfect right to make an absolute or conditional transfer, to sell or hypothecate them: Fatman *v.* Lobach, 1 Duer 355, 361.

[Wood's Appeal.]

Where a third person innocently and in good faith advances money to a holder of stock upon the faith of the certificates, thus accompanied with absolute bills of sale and powers to transfer, without any actual notice of the private equities existing between such holder and the executor, he will be protected to the extent of his advances as a bona fide purchaser for value without notice.

It cannot be denied that the appellee by his advance became a purchaser to the extent of the amount advanced: Petrie *v.* Clark, 11 S. & R. 377; Lancaster *v.* Dolan, 1 Rawle 231.

But it is submitted that neither the doctrines of agency nor of negotiability affect the question. The principle rests upon entirely distinct and well-established grounds, and it applies to the least negotiable of all securities, such as title deeds.

Where one is invested (either by the act of the law or of the parties) with the possession and authority to dispose of stock of an inscribed owner, and voluntarily delivers that possession and authority to others, and third persons deal upon the faith of such possession without actual notice, all claimants under the inscribed owner (by whose act alone the party in default acquired possession) are estopped from avoiding the title thus subsequently obtained: McNeill *v.* The Bank, *supra;* Fatman *v.* Lobach, *supra;* Leavitt *v.* Fisher, *supra;* Denny *v.* Lyon, 2 Wright 98; Persch *v.* Quiggle, 7 P. F. Smith 247; Moodie *v.* The Bank, 3 W. N. C. 118; Ryall *v.* Rowlens, 2 Leading Cases in Equity, part 2, p. 1673, 4th Am. ed. This principle applies whether the stock stands in the name of a living owner or of a decedent. The only distinction is when one deals directly with the executor, and knows, or ought to have known, that the latter was using the securities of the estate for his own purposes.

So far and no further is there a distinction between stock of the dead and stock of the living. But when the former comes upon the market, not offered by the executor, but by a third party, there is no distinction whatever between them: Pratt *v.* Tilt, 28 N. J. Eq. R. 70; Prall *v.* Hamil, Id. 66; Jarvis *v.* Rogers, 13 Mass. 105; Stinson *v.* Thornton, 56 Georgia 377; Nutting *v.* Thomason, 46 Id. 34; Pennsylvania Railroad Co.'s Appeal, 5 Norris 80; Weaver *v.* Barden, 49 N. Y. 288.

Mr. Justice Trunkey delivered the opinion of the court, May 3d 1880.

The able and elaborate report of the master so well sustains his conclusion and the decree of the court, as to obviate labor in affirmance.

The appellants concede 1. That where the owner sells stock and gets his price, and delivers the certificate, together with a blank bill of sale and irrevocable power of attorney, signed by himself, the title vests in the purchaser; and 2. When a living owner signs

such papers in blank, if he has not actually sold and got his price for the stock, by intrusting them to another, he delegates all his powers in respect to the stock, which being unlimited, he by estoppel will lose his property, if his agent abuses his confidence. They deny that such papers pass title by delivery, and allege, they are only symbols in the hands of the holder, affording no presumption that he is the owner of the stock, but are consistent with an agency to act for the signer.

The rights of a bona fide holder, as against the true owner of the stock, to whom the apparent owner has either sold or pledged, do not depend on a negotiable character in the certificates, but rest on another principle; "namely, that one who has conferred upon another by a written transfer all the *indicia* of ownership of property, is estopped to assert title to it as against a third person, who has in good faith purchased it for value from the apparent owner." As a general rule, the vendor or pledgor can convey no greater right or title than he has. Simply intrusting the possession of a chattel to another as a depositary, pledgee or other bailee, is insufficient to prevent the real owner reclaiming his property in case of an unauthorized disposition of it by the person so intrusted. The mere possession of chattels, without evidence of property or authority to sell from the owner, will not enable the possessor to give good title. But if the owner intrusts to another the possession of property, and also written evidence of title and power of disposition over it, as respects innocent third persons, he is deemed as intending it shall be disposed of at the pleasure of the depositary. If there be conditions on which this apparent right of control is to be exercised, not expressed on the face of the instrument, the case, in principle, is like that of an agent who receives secret instructions qualifying or restricting an apparent absolute power. If the owner of the stock voluntarily give certificates with blank assignment and power to make transfers, to his brokers, who betray the confidence reposed in them, such owner must suffer the loss, rather than innocent strangers whose money the brokers were thereby enabled to obtain. The principle applies to pledges of stock, and one who purchases from the pledgee may hold against the pledgor. And if the pledgee pledge it to secure payment of his own debt, the second pledgee may hold it as security till his debt be paid. "A person loaning money on such certificate and power, has a right to believe that the borrower from whom he receives them has an absolute right to pledge the stock." By commercial usage, a certificate of stock accompanied by an irrevocable power of attorney, either filled up or in blank, is, in the hands of a third party, presumptive evidence of ownership in the holder. And where the party in whose hands the certificate is found is a holder for value, without notice of any intervening equity, his title cannot be impeached: Moore *v.* Metropolitan National

Bank, 55 N. Y. 41; McNeil *v.* Tenth National Bank, 46 Id. 325; Pratt et al. *v.* Tilt et al., 28 N. J. Eq. 480; Bridgport Bank *v.* New York and New Hampshire Railroad Co., 30 Conn. 275; Mount Holly Turnpike Co. *v.* Ferree, 2 C. E. Green 117.

The doctrine of these and kindred cases is not in the least shaken or qualified by the late decision in Shaw et al. *v.* The Merchants' National Bank of St. Louis, S. C. U. S., 37 Leg. Int. 135, where the distinction between negotiable paper and bills of lading is pointed out with great clearness. Between such paper and certificates of stock, the distinction may be as wide. Perhaps, under similar circumstances, like rule would be applied to the holder of a stolen certificate as to the holder of a stolen bill of lading, but such is not this case. There the court say, "It may be that the true owner, by his negligence or carelessness, may have put it in the power of a finder or thief to occupy ostensibly the position of a true owner, and his carelessness may estop him from asserting his right against a purchaser who has been misled to his hurt by that carelessness. But the present is no such case. It is established by the verdict of the jury that the bank did not lose its possession of the bill of lading negligently. There is no estoppel, therefore, against the bank's right." The bill of lading having been stolen without fault in the owner, he was held entitled to recover against a purchaser who had reason to believe that his vendor was not the owner, but held it to secure the payment of an outstanding draft. Nothing in the case tends to show that if the owner had voluntarily given that bill of lading to another, he could have recovered against a purchaser for value who took it in good faith.

We are convinced that the master adopted the true principle applicable to the papers in question; he neither held that they were negotiable, nor that it was a mere matter of the actual agency or authority of MacDowell & Wilkins.

Do the same rules apply to these stocks as if they belonged to a living owner? An executor holds under a trust; he is the minister or dispenser of the goods of the dead. He has the same property in the personal effects as the deceased had when living. It is a general rule of law and equity, that an executor has an absolute power of disposal over the personal effects of his testator, and they cannot be followed by creditors nor legatees into the hands of the alienee. This results from the fact that in many instances the executor must sell in order to perform his duty in paying debts, &c.; and no one would deal with him if liable afterwards to be called to an account. Co-executors are regarded in law as an individual person; and the acts of any one of them, in respect to the administration of the effects, are deemed to be the acts of all; as where one releases a debt or settles an account of a person with the deceased, or surrenders a term, or sells the goods and chattels of the estate, his act binds the others. An exception

[Wood's Appeal.]

to this general power will be found in those cases only when collu-sion exists between the executor and purchaser. That the executor may waste the money is not alone sufficient to invalidate the sale; it must further appear that the purchaser participated in the *devas-tavit* or breach of duty in the executor. Thus, when the person to whom the executor passes the property, knows that the executor is acting in violation of his trust and in fraud of those interested in the due administration of the assets, the fraud vitiates the trans-action, and the attempted transfer is void. These familiar elements, the base of the master's reasoning, are its sure support.

Were McDowell & Wilkins defendants instead of their pledgees, the appellants' argument, would be irresistible; for they participated in the wrongful act of George R. Wood. As executor, he could not make a valid sale or pledge of the stock as a security for or in payment of his own debt to them; the transaction itself gave them notice of the misapplication, and involved them as participants in the breach of duty. Where money was obtained on the security of stock belonging to an estate, the borrowers, sons of the tes-tator, represented that they owned and had the right to pledge it, but the transfer was made by the executrix to the lenders, who gave her a receipt stating the purpose for which they held it, and that it was to be returned to the estate if their debt was paid, the transaction gave the lenders notice, and the trust was not divested : Prall *v.* Hamil, 28 N. J. Eq. 66.

An executor's duty is not like that of a trustee, in whom pro-perty is vested, not for administration or sale, but custody and management for his *cestuis que trust*. The party taking stock on pledge from such trustee deals with it at his peril, for there is no presumption of a right to sell it, as there is in the case of an executor : Duncan *v.* Joudon, 15 Wall. 165 ; Shaw *v.* Spencer, 100 Mass. 382.

" The executor has the right to sell and transfer, and one who buys of him in good faith, and pays in money the price agreed upon, is not responsible for the application of the purchase-money :" Per Hunt, J., Leitch et al. *v.* Wells et al., 48 N. Y. 585. Letters of administration are always sufficient evidence of authority to transfer, because a sale and transfer of stock is in the line of the duty of an administrator. The powers of an executor or administrator differ from those of an ordinary trustee; the duty of the latter being custody and management, of the former to dis-pose of the personal property, to pay debts, &c. Executors may use specific legacies to pay debts, if necessary : Bayard *v.* Far-mers' and Mechanics' Bank, 2 P. F. Smith 232. The fact that the legal title to the stock was known to have previously been in the executor, and that the title of the holder appeared on its face to have been derived from him in his representative capacity, will not raise a suspicion, or put a purchaser on inquiry, for the reason

[Wood's Appeal.]

that it is the executor's primary duty to dispose of the assets and settle the estate : Prall *v.* Tilt, *supra.* We think the master was right in holding " that the same principle which prevails in the case of an absolute owner applies in the case of an executor who invests the holder with apparent ownership."

The defendants had a right to infer that MacDowell & Wilkins were the owners of the stock, although the certificates showed title in Charles S. Wood, and the blank assignments and powers were signed by George R. Wood as acting executor. They found McDowell & Wilkins clothed with apparent ownership. The testator had given George R. Wood the strongest expression of confidence in making him an executor of his will, thereby vesting absolute power in him to sell and transfer the stock in the line of his duty. He was acting executor. Neither his co-executors, nor others interested in the estate, had taken a step to prevent him from committing waste. The law casts no duty upon a purchaser to ascertain if the trusted executor of the decedent's will is mismanaging the estate in fraud of creditors or legatees. The defendants had no knowledge of the collusive transaction between the executor and MacDowell & Wilkins, nor reason to believe that they, the pledgors, were not the real owners, as they appeared. If it be that the perfidious conduct of the executor results in loss to innocent persons, either those interested in the estate or the pledgees of the stock, it must fall on those whose interest he betrayed.

> Decree affirmed, at the cost of appellants, and appeal dismissed.

Justice Paxson, dissented.