## Souder, Appellant, v. Columbia National Bank.

[Marked to be reported.]

*Corporations—Transfer of stock—Evidence.*

A certificate of stock accompanied by an irrevocable power of attorney, either filled up or in blank, is, in the hands of a third party, presumptive evidence of ownership in the holder. And where the party in whose hands the certificate is found is a holder for value without notice of any intervening equity, his title cannot be impeached.

*Married women—Transfer of stock—Consent of husband.*

Prior to the Married Persons Property Act of 1887, a married woman

could not transfer stock without the consent of her husband, but the consent of the husband may be shown by the fact that he filled in the blanks in the transfer and power of attorney in his own handwriting, and signed the same as a witness to his wife's signature.

*Stock transfer—Notice of husband's consent.*

Where a transfer of stock and power of attorney executed by a married woman shows on its face that the blanks were filled in by the husband in his own handwriting, and that he signed it as a witness, persons taking the stock from the wife's assignee are not put upon inquiry as to the husband's consent.

In such a case the fact that nearly two years elapsed between the transfer by the wife, and the retransfer by her assignee, is neither a ground of suspicion, nor a cause for inquiry. On the contrary the lapse of time was in favor of the validity of the title, as it indicated unquestioned ownership and acquiescence in the same.

Argued May 18, 1893. Appeal, No. 75, July T., 1893, by plaintiff, Mary E. Souder, from decree of C. P. Lancaster Co., Equity Docket, No. 2, page 402, dismissing bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and THOMPSON, JJ.

Bill for surrender of certificate of stock.

The case was referred to George Nauman, Esq., who reported the facts to be as follows:

" William Danner, of the city of York, died some time prior to the year 1886. He had made a will, of which William H. Souder and James M. Danner were the executors. He left no widow and but two children, James M. Danner and Mary E., married to William H. Souder. He seems to have divided his estate equally between these two children. In the year 1886, James M. Danner and Michael Schall were engaged in business as brokers and bankers in the city of York, under the firm name of Schall & Danner. William Danner was the holder of four hundred and fifty-six shares of the capital stock of the York National Bank, a banking corporation organized under the laws of the United States.

" On March 17, 1886, at the instance of the executors of the will of William Danner, the York National Bank issued, in lieu of the four hundred and fifty-six shares so held by William Danner, two certificates, each for two hundred and twenty-eight shares, one to James M. Danner, and one to Mary E.

Souder.    At this time Schall & Danner were largely indebted to
Mary E. Souder.    The exact amount of the indebtedness is
not given, but it was perhaps as great as $70,000.

"James M. Danner, on March 25, 1886, called upon his sister
for the purpose of borrowing from her, on behalf of Schall &
Danner, the certificate of stock issued to her by the York Na-
tional Bank for two hundred and twenty-eight shares.    There
seems to have been considerable demur and objection on the
part of both Mrs. Souder and her husband, who was present at
the interview, to the lending of the stock, but, as the result of
the interview, the certificate was delivered to James M. Danner,
it being lent for sixty days, and to be returned at the end of
that time.    As a memorandum of the transaction, a note for
$11,000, payable one day after date was given on March 25,
1886, to Mrs. Souder by James M. Danner and Michael Schall.
This note was drawn by Mr. Souder.    Accompanying the cer-
tificate of stock, a power of attorney to transfer the same and
in blank was given to Mr. Danner.    It was a printed form, and
was signed by Mrs. Souder.    The date was filled in by Mr.
Souder, the number of shares and name of the bank by Mr.
Schall, and the paper was witnessed by Mr. Souder.

"The master finds as facts that it was only after considerable
persuasion that Mrs. Souder parted with the certificate, and
that Mr. Souder objected to its delivery, but that he drew the
note for $11,000 given as a memorandum of the transaction,
and that he wrote the date in the power of attorney, and wit-
nessed the same after its execution by his wife.    He also finds
as a fact that the stock was lent for but sixty days, and was to
be returned at the expiration of that time.

"What was done with the stock after its delivery does not
appear in the evidence until more than two years had elapsed.
On April 13, 1888, Schall & Danner procured from the Co-
lumbia National Bank a loan of $20,000, pledging, as security
therefor, the certificate for two hundred and twenty-eight shares
of the York National Bank issued to James M. Danner on
March 17, 1886, and the certificate for two hundred and twenty-
eight shares of the same stock issued to Mrs. Souder, together
with the power of attorney executed by her on March 25, 1886.
The Columbia National Bank made the loan in good faith, and
had no knowledge of the ownership of Mrs. Souder's stock

other than was given by the certificate and power of attorney. Mr. Meyers, the president of the bank and the officer who made the loan, knew that William H. Souder was the husband of Mary E. Souder.   Mrs. Souder did not discover that her certificate of stock was in the hands of the Columbia National Bank until some time in February or early in March, 1891, and her husband notified the York National Bank not to make a transfer of the stock.   On March 25, 1891, Schall & Danner made an assignment for the benefit of creditors.   The firm is insolvent."

The master recommended that the bill should be dismissed. Exceptions to the master's report were dismissed and a decree entered dismissing the bill.

*Error assigned* was decree, quoting it.

*E. W. Spangler* and *J. Hay Brown,* *W. U. Hensel* with them, for appellant.—Prior to the act of 1887, a married woman could not transfer stock without the consent of her husband: Leiper's Ap., 108 Pa. 377.

Where the signatures to powers of attorney are genuine and considerable time has elapsed from the time the blank power of attorney was made, the party taking the stock on the strength of such transfer must be put upon inquiry: Pa. R. R. Co.'s Ap., 86 Pa. 80 ; Bradlee & Co. v. Whitney & Kemmerer, 108 Pa. 362 ; Ryman v. Gerlach, 153 Pa. 197.

In no one of the many cases cited for defendant did the husband's signature appear simply as a witness, except in the case of Brown's Ap., 94 Pa. 362; and in that case it was decided not only that the contract was executed, but the husband had actually consented to what his wife had done for his benefit.

In Gyger's Est., 65 Pa. 311, it was held that the assent of the husband will be evidenced by his uniting in the administration bond with his wife, as it would be here, if Souder had signed the power of attorney and transfer with the plaintiff.

In Dando's Ap., 94 Pa. 76, the husband and wife jointly executed the promissory note and acted jointly in the negotiation.

Wherever a married woman undertakes to do that which she has not the power to do, she can at any time assert her incapacity, and the doctrine of estoppel will not apply: Glidden v.

Strupler, 52 Pa. 400 ; Quinn's Ap., 86 Pa. 447 ; Leiper's Ap., 108 Pa. 377.

When the sixty days expired and the loan was paid by Schall & Danner for which the stock was originally pledged (for the loan must have been paid, otherwise Schall & Danner could not have had the stock returned so as to pledge it to the Columbia National Bank), the authority of Schall & Danner was exhausted, and the Columbia National Bank acquired no legal title to the stock : Bank v. Lyon, 38 Pa. 98 ; Leiper's Ap., 108 Pa. 377.

*H. M. North,* for appellee.—Souder knew what the paper he signed was, knew its contents, knew the purpose of it, and the result was to take it out of the possession of his wife to be used by Schall & Danner, and there surely can be no complaint now that the purpose for which she gave it was accomplished.

The assent of the husband is necessary to the grant of administration to his wife, and the assent will be evidenced by his joining in the administration bond : Gyger's Est., 65 Pa. 311.

The Columbia National Bank is an innocent holder for value, having made a loan on the faith and credit of the said shares, for which the certificate was produced, with a power of attorney executed and delivered, and it was an irrevocable one.

The papers were in proper form, carrying on their face all the indicia of ownership in Schall & Danner, and were accepted by the bank without notice and for a valuable consideration, and, therefore, it is wholly immaterial whether Mr. Souder gave his consent or not.

The authority to transfer must be construed to carry with it all the necessary powers to make it effective, and among these is the power to do it by attorney : Farmers & Mechanics' National Bank v. Loftus, 25 W. N. 462 ; German U. B. and S. F. Association v. Sendmeyer, 50 Pa. 67 ; Finney's Ap., 59 Pa. 398 ; Haffey v. Carey, 73 Pa. 431 ; Bond v. Bunting, 78 Pa. 219 ; Dando's Ap., 94 Pa. 76 ; Selden v. Merchants' National Bank of Meadville, 69 Pa. 424 ; Brown's Ap., 94 Pa. 362.

A married woman should be held to the observance of that good faith in her dealings with the world to which others are

bound; her protection is for the prevention of fraud; she should not thereby be enabled with impunity to defraud others: Powell's Ap., 98 Pa. 403; Brown's Ap., 94 Pa. 362; Bucknor's Est., 136 Pa. 23.

While silence, in ignorance of one's own right, or of another's expenditure under a claim of right, will not estop, yet mere silence with knowledge is evidence from which a jury may find an estoppel, on the ground that the knowledge created a duty to speak: McCullough v. Wilson, 21 Pa. 436; Leiper's Ap., 109 Pa. 377; Wood's Ap., 92 Pa. 379; Burton's Ap., 93 Pa. 214; Hinkle v. Landis, 131 Pa. 573; Ryman v. Gerlach, 153 Pa. 197; Penna. Co.'s Ap., 86 Pa. 102; Fisher v. New York & Middle Coal Field R. R. & Coal Co., 31 W. N. 502; Pennsylvania R. R. Co.'s Ap., 86 Pa. 80; Xander v. Com., 102 Pa. 434.

OPINION BY MR. JUSTICE THOMPSON, July 19, 1893:

The formation of stock companies in the last half century has led to a gigantic development of manufacturing, mining and transporting interests. The trend of judicial decisions in regard to the millions of dollars represented by certificates of stock issued by them is for public convenience, towards a facility in making their sale and transfer, and the avoidance of that which would tend to hamper the same. While they are not in form or effect negotiable, yet they are for the purpose of sale and transfer given an approximate character. A certificate with an assignment in blank with an irrevocable power of attorney executed is when held by a third party evidence of ownership, and such title, when based upon value and without notice of intervening rights, cannot be successfully attacked. In the stock markets large numbers of certificates pass constantly from sellers to purchasers by the execution of assignments in blank and irrevocable powers of attorney. These transactions have their warrant in judicial decision. In Finney's Ap., 59 Pa. 400, it is said: " Pennock having assigned to Snowden, and delivered to him the certificate, with a power of attorney to transfer the stock on the books of the company a month and a half before the levy at the instance of Finney, trustee, passed Pennock's interest in it to him, and although it stood on the books of the company in the name of Pennock, a sale of it in his name would not divest Snowden's prior title; so that Snowden's sale after-

wards, in pursuance of the pledge of the stock, with notice to Finney and Pennock, passed a good title to the stock. That this was the effect of the assignment and delivery of the stock to Snowden is clearly shown in Commonwealth v. Watmough, 6 Wharton, 117, and in Building Association v. Sendmeyer, 14 Wright, 67."

Without doubt the holder of a certificate of stock with an assignment in blank and an irrevocable power of attorney executed without notice, and for value, will be protected in his title. Such protection has its foundation in the principle that the owner having placed all the indicia of title in another, will not be permitted to deny the title of the vendee who has purchased the same on their faith, and without notice of the owner's rights. But it is here contended that as appellant was a married woman in 1886, when she delivered the certificate and executed the assignment in blank and irrevocable power of attorney, no title passed to the holder, because it lacked the essential necessary to pass title, namely, the assent of her husband. At the time of their execution the assent oral or written of the husband was necessary to pass title to the holders.

The husband testified that he objected to the loan of the stock to her brother, "that he signed the power of attorney as a witness, that the brother asked him to sign it and that he objected all along, before the signatures were put down;" and after the papers were executed, he says: "I don't know that I said anything after I found that they were signed and delivered, I don't know that I objected any more." When asked what he said to indicate his objection, he replied: "I don't just remember the remark that I made, except this one thing: I said to him, says I, if you take this stock if you get it, it would go the way the First National Bank stock went, which you borrowed and neglected to return." At the time the stock was loaned, a note for $11,000 was given to appellant, and this was in the writing of the husband. The wife, the appellant, says she signed the power of attorney and that she received the note for $11,000 and that her husband said "that he was afraid that when the time went around (60 days) he would not return it. It would be like that First National Bank stock, he would keep it. That was all he said." When asked if he signed it of his own accord, she replied that "while there was no other witnesses there I do

not know what he did of his own accord.   Of course we had
to have a witness to the transfer."

The brother James M. Danner testified that he was pretty
positive " that the words filled in with pen, on the date of the
power of attorney 25th day of March, A. D. 1886, are in the hand-
writing of William H. Souder, that he handed him the certifi-
cate and power of attorney."   " I think my sister objected."
" She said as much as we did not like to give up the certificate
without its value for it, and we talked the matter over and I
suggested to Mr. Souder that we give an individual note and
he suggested that the amount be $11,000 at 60 days.   He seem-
ed to be satisfied and he said he would witness the signatures
and he drew the note, and I took the note to Schall's house, and
got him to sign it."   Again: " Mr. Souder said that Mary ought
to have something to show that she had given up the certificate,
and suggested that we should give an individual note.   And
Mr. Souder named the amount and filled up the note, and I took
it to Mr. Schall's as I said before, and had him sign it, as you
see in the note."   " Then when I brought the note back, I don't
know whether Mr. Souder had signed the certificate before or
after I had brought the note back."   On cross-examination he
was asked: " Aint it a fact that Mr. Souder refused to con-
sent to your taking the stock away ? "   He answered: " He did,
until I suggested we give her that note, and then he witnessed
my sister's signature."

The master finds : " There seems to have been considerable
demur and objection on the part of Mrs. Souder and her hus-
band, who was present at the interview, to the lending of the
stock, but as a result of the interview the certificate was de-
livered to James M. Danner, it being lent on 60 days and to be
returned at the end of that time.   •As a memorandum of the
transaction a note for $11,000, payable one day after date, was
given on March 26, 1886, by James M. Danner and Michael
Schall.   This note was drawn by Mr. Souder.   Accompanying
the certificate of stock was a power of attorney to transfer the
same in blank, and was given to James M. Danner.   It was a
printed form and was signed by Mrs. Souder."   The date was
filled in by Mr. Souder, also the number of  shares and name
of the bank, and the paper was witnessed by him.

It appears that while the husband originally objected, yet the

drawing of the note, the filling up the blank in the power of attorney and the witnessing it, justify the conclusion that he did finally consent to the transfer and delivery of the stock by his wife. He witnessed that it was "signed, sealed and delivered" in his presence. It is not possible that he intended when he thus witnessed her execution and delivery that he did not assent thereto. His assent to the execution and delivery of the assignment and power of attorney is therefore manifested by his signature as a witness. In Brown's Appeal, 94 Pa. 367, where the wife certified that a new judgment should take precedence of one held by her, in order to secure a loan for her husband, the instrument was witnessed by him, and it was held to be an executed certificate which operated as a release of her prior right of lien.

It is contended that as appellant's husband did not unite with her in the execution of the assignment and power of attorney, the holders in pledging the stock were not clothed with an apparent title, and, under Leiper's Appeal, 108 Pa. 383, the appellee is not entitled to be protected in its title. But in that case there was no evidence upon the instrument of the husband's assent and nothing to indicate it, and Mr. Justice TRUNKEY said : " The powers of attorney signed by Mrs. Leiper not being accompanied by written evidence of the assent of her husband, prima facie were insufficient to vest the apparent title to the stock in Green. His right depended on oral and written evidence. Without oral testimony of Leiper's assent, the writing of his wife passed nothing. They did not confer upon Green by a written transfer all the indicia of ownership of the stock ; the written assent of the husband was wanting." Again : " The fact that Mary Leiper alone signed the powers was enough to warn purchasers or pledgees to ascertain whether she made the transfers with her husband's assent."

In the present case, when the appellee made the loan and received the stock as a security, it found the assignment and power of attorney duly executed by appellant, the date in her husband's writing, and his signature thereto witnessing her signing, sealing and delivery of the stock. This evidence of his assent was upon the instrument itself, and parol testimony was not necessary to establish it. The purpose of its execution was to make an assignment of the stock with power to make a

transfer upon the books of the bank, and, to consummate it, appellant's husband witnessed it.   To say that he did not assent to it, when he signed for that purpose, is to assert that which the act conclusively negatives.   When the holders made the loan from this appellee they thus possessed all the indicia of title of the stock, and, if so, it will be protected in its title, obtained from them.   In Wood's Appeal, 92 Pa. 390, it is said : " By commercial usage a certificate of stock accompanied by an irrevocable power of attorney either filled up or in blank is in the hands of a third party presumptive evidence of ownership in the holder.   And where the party in whose hands the certificate is found is a holder for value without notice of any intervening equity his title cannot be impeached."   The title to this stock, obtained by appellee, from its holders, clothed with ownership, is therefore unimpeachable unless it had notice of the claim made to it by appellant.   While it is conceded that, when it made the loan upon this stock, it did so in good faith and without any knowledge of any claim, it is urged that the appellee was put upon inquiry, which is the equivalent of actual notice.   As the holders, when they effected the loan from the appellee, were in the possession of the stock and had the written evidence of ownership, common prudence and ordinary diligence did not call for inquiry, and, under such circumstances, to require it would be to exact caution, without any reason for it.

In Leiper's Appeal, supra, it is said : " Just here this case difers from Wood's Appeal, 92 Pa. 379, Burton's Appeal, 93 Pa. 214, and other cases controlled by like principle, wherein the transferees not only found the possessors of the stock from whom they purchased, clothed with written evidence of ownership, but no circumstance to put them on inquiry."

While there was nothing in the execution of the assignment and power to put appellee upon inquiry, the fact, that the ownership established by the indicia of title possessed by the holders, was dated nearly two years previous to the loan, cannot be said to be either a ground of suspicion or a cause for inquiry.   As the appellant had executed the assignment and the power of attorney and as her husband had assented thereto as shown by the instrument itself, it was not a matter of significance against the title, whether they did so many months previously, but on

the contrary was in favor of it, because indicative of an unquestioned ownership and an acquiescence in the same for a length of time.

For these reasons this decree is affirmed.