## West & Co. v. Montgomery National Bank et al.  West & Co. v. Norristown Insurance and Water Co. et al.

*Corporations—Stock certificates—Transfers—Protection of bona fide purchasers—Assignments—Assignments in blank.*

1. The courts will protect *bona fide* purchasers of stock certificates and will encourage the free circulation of such certificates.

2. Stock certificates are a valuable aid to commercial transactions, and the public interest is best subserved by removing all restrictions against their circulation and by placing them as nearly as possible on the plane of commercial paper.

3. In construing an assignment of corporate stock, the court should take into account surrounding facts and circumstances and the assignment is not required to be in any particular form.

4. Where a swindler secures from a woman by misrepresentation stock certificates duly endorsed by her for transfer, *bona fide* purchasers of such certificates will be protected against her claim of ownership.

5. Where one of two innocent persons is to suffer for the tortious act of a third, he who gave the aggressor the means of doing the wrong must alone bear the consequences of the act.

6. Where the owner of an old certificate of stock, which has no transfer printed on its back, signs his name at such a place on the back as to allow space for a blank assignment and power to be written above it, it will be assumed that the owner intended his signature to operate as a transfer in blank, with the formal assignment and powers to be written in afterwards by some subsequent holder.

7. Until such powers and assignments are written in, the corporations issuing the stock cannot be compelled to make the transfer and issue a new certificate.

8. The Uniform Stock Transfer Act of May 5, 1911, P. L. 126, was declaratory of the existing law.

Bill in equity for injunction. C. P. Montgomery Co., Sept. T., 1924, Nos. 4 and 5.

MILLER, P. J., Dec. 28, 1925.—After hearing the evidence and arguments of counsel, we find the facts and draw therefrom the conclusions of law which follow.

### Findings of fact.

1. The plaintiffs are stock brokers and investment bankers, buying, selling and otherwise dealing in stocks, bonds and other securities, with a principal office in Philadelphia, Pa., and branches in New York City and elsewhere. They do an extensive business and are of high standing and repute.

2. Mary Ann Davis is an unmarried woman who lives utterly alone in a house which she owns in Norristown, Montgomery County. Prior to June, 1924, she was possessed of substantial means. She is upwards of seventy-eight years of age and enjoys physical health that is fairly good, but men-

tally she is somewhat impaired—although never having been so adjudged. Except a deposit in bank, she kept her securities in her house. She had never made an income tax return to the Federal Government nor paid any such tax.

3. Montgomery National Bank of Norristown is, as its name indicates, a chartered national bank of Norristown aforesaid, and the Norristown Insurance and Water Company is the local public service water company operating under a Pennsylvania charter.

4. On a day in June, 1924, Miss Davis, who was inside her house, heard a young man, who was a total stranger to her, knocking at her front door. She admitted him to the house. He represented falsely to her that he had been sent to investigate why she had not made income tax returns nor paid any such tax, informed her of the possible consequences, and so preyed upon her fears that, when he left, he carried with him a large number of her stock certificates for submission, as he deceitfully assured her was necessary, to his superiors at Washington. He had had her sign her name in ink on the back of such as did not, because of their age, have printed on them blank assignments and powers to transfer, and on those which had blank assignments and powers of attorney printed on their backs he had had her sign such at the end and in the proper place.

Miss Davis, when she delivered these certificates to her caller, did not intend to sell them or to part with their ownership, nor did she receive any value or consideration for them. She knew, however, that "when you sold stock, you signed it on the back." Notwithstanding her age, decrepitude and impaired mental condition, she had been made the victim of a heartless fraud and her property had been fraudulently obtained from her by misrepresentation, imposition and deceit. None of it was ever returned to her. She thus turned over to the stranger certificates of stock, all made out in her name, representing her holdings in at least ten Pennsylvania corporations; said investments were of the best, and they had a value running into many thousands of dollars. The stranger, who gave the name of Seymore, was not shown to be a stock broker, and we find that Miss Davis did not intend to constitute him her agent to dispose of said certificates.

5. Amongst the certificates so delivered by her to the strange caller were:

(a) No. 83 of Montgomery National Bank of Norristown, dated March 16, 1880, to Mary Ann Davis, for six shares of its capital stock.

(b) No. 847 of the same bank, dated Feb. 9, 1891, to Mary Ann Davis, for four shares of its capital stock.

(c) No. 2110 of the Norristown Insurance and Water Company, dated Aug. 4, 1909, to Mary Ann Davis, for twenty-five shares of its capital stock; and

(d) No. 2173 of the last-named corporation, dated April 11, 1910, to Mary Ann Davis, for three shares of its capital stock.

None of these four certificates had printed upon its back or attached to it a blank assignment and power of attorney to transfer, but all, when delivered by Miss Davis to the stranger, had her name written in ink upon the back so far down as to allow abundant space to write or type such assignment and power above the signature.

6. Amongst the certificates so delivered by Miss Davis to the strange caller was also No. 2429 of the Norristown Insurance and Water Company, dated March 10, 1911, to Mary Ann Davis, for nine shares of its capital stock.

This certificate had printed upon its back the usual blank assignment and power to transfer, and, before it was so delivered by her, she had signed her name, "Mary Ann Davis," to it in ink in the proper place at its end and also

after the words "Know all men by these presents that," at the beginning or top.

7. And amongst the certificates so delivered by Miss Davis to the strange caller was also No. 3074 of the Norristown Insurance and Water Company, dated Sept. 4, 1918, to Mary Ann Davis, for four shares of its capital stock.

This certificate had printed upon its back the usual blank assignment and power to transfer, and, before it was so delivered by her, she had signed her name, "Mary Ann Davis," to it in ink in the proper place at its end and also after the words "Know all men by these presents that," at the beginning or top.

8. Tilden, Reade & Co., Incorporated, were, in June, 1924, engaged in business in New York City as dealers in investment securities. On June 9, 1924, it wrote to plaintiffs at Philadelphia, saying: "We are interested in securing firm bid and asked prices on the following securities. . . . We trust that you will expedite your reply, as we have a party who may be interested in same." The list of securities set forth in the letter showed the names of ten Pennsylvania corporations, including Montgomery National Bank and Norristown Insurance and Water Company, her certificates, in all of which Miss Davis had, as found already, earlier in the same month delivered to the strange young man who had called upon her.

9. There are about 2500 stock and investment brokers in New York City, of whom about 250 are known, actually or by reputation, to West & Co. When this letter was received by West & Co., they did not know nor had they heard of Tilden, Reade & Co., Incorporated.

10. Plaintiffs upon receipt of the letter mentioned in our 8th finding knew, of course, that, of the stock enumerated, Pennsylvania Salt Manufacturing Company and United Gas and Improvement Company were listed and had to be sold and bought on the exchange and that all the rest were unlisted.

11. A "firm bid" is a definite offer to pay a certain price; and a "subject bid" is tentative, in that it is subject to future confirmation or the performance of some other condition. By "checking the market" is meant inquiry of specialists, dealers and others having superior knowledge on the subject concerning the market price of unlisted securities.

12. Upon receipt of the letter mentioned in our 8th finding, plaintiffs, by their regular trader, an experienced man who had been in their employ for six years, promptly checked the market on the unlisted securities mentioned, obtained firm bids on some and subject bids on others, and afterwards, in regular course of business and in good faith, communicated with Tilden, Reade & Co., Incorporated, making firm bids on some and subject bids on others. Plaintiffs did not then know in whose name the certificates for the stocks mentioned were made out.

With a firm bid of $280 a share for Montgomery National Bank stock in hand, plaintiffs made to Tilden, Reade & Co., Incorporated, a similar bid of $275 and obtained the stock, which they then agreed to sell at $280 per share to William H. Slingluff, president of the bank.

With a firm bid from Barnes & Lofland of $53 per share for Norristown Insurance and Water Company stock, plaintiffs made a similar bid of $50 to Tilden, Reade & Co., Incorporated, and were sold the stock, which plaintiffs agreed promptly to resell to Barnes & Lofland at $53. The last reported previous sale of this stock had been at $80, but it was not shown when that sale had taken place nor under what circumstances, and it was established as a fact, and we so find, that a thirty-point fluctuation in an inactive, unlisted stock, especially when there are long periods between sales, is not unusual.

Plaintiffs also, under similar circumstances, acquired all the other stocks mentioned and promptly thereafter either agreed to sell, or did actually sell, them at an advance of a few points, showing a reasonable business profit. While this was the only transaction plaintiffs ever had with Tilden, Reade & Co., it, so far as they were concerned, was a legitimate and perfectly regular one, conducted by them in entire good faith, and embraced many securities in addition to those involved in this litigation.

13. As the stocks were acquired by plaintiffs the certificates, by their direction, were delivered by Tilden, Reade & Co., Incorporated, by runner, at plaintiffs' New York City office and paid for by check as deliveries were made. Amongst the many certificates so delivered and paid for were the six described in our 5th, 6th and 7th findings.

14. When so delivered to plaintiffs' cage-man or representative at their office in New York City on June 17, 1924, and paid for, certificates *"(a)"* and *"(b),"* described in our 5th finding, had written or endorsed upon them in ink, below the signature "Mary Ann Davis," the following:

"H. SEYMORE.

H. SEYMORE.

MICHAEL LIEBSTER.

Signature of Michael Liebster guaranteed

Hamilton National Bank of<br>New York<br>(Name undecipherable)<br>Cashier."

15. When so delivered to plaintiffs' cage-man or representative at their office in New York City on June 21, 1924, and paid for, certificates *"(c)"* and *"(d),"* described in our 5th finding, had written or endorsed upon them in ink, below the signature "Mary Ann Davis," the following:

"H. SEYMORE.      H. SEYMORE<br>
            WILLARD KOHN CO.<br>
            Signature guaranteed only.<br>
            MARKS & GRAHAM."

16. When so delivered to plaintiffs' cage-man or representative at their office in New York City on June 21, 1924, and paid for, the certificates described in our 6th and 7th findings had written or endorsed upon them in ink, below the signature "Mary Ann Davis," at the end or bottom of the printed assignment and power, the following:

"H. SEYMORE.      H. SEYMORE<br>
            WILLARD KOHN CO.<br>
            Signature guaranteed.<br>
            MARKS & GRAHAM."

17. Plaintiffs having agreed to sell the ten shares of Montgomery National Bank stock, for which they had paid $275 per share, to William H. Slingluff, who is president of the bank, for $280 per share, on June 19, 1924, mailed both certificates to Mr. Slingluff for transfer. They had, on the same day or earlier, mailed a blank assignment and power of attorney to transfer to Miss Davis, with a request that she execute it and deliver it to Mr. Slingluff, who was well known to her. They informed Mr. Slingluff of this fact when they sent the certificates to him. Miss Davis called later on Mr. Slingluff, informed him of the circumstances under which she had parted with her stock, and refused to execute the assignment and power. Mr. Slingluff then declined

to buy the stock, and both certificates were returned by him to West & Co. It was in this way that plaintiffs first learned of any irregularity or wrong in Miss Davis's parting with her securities.

18. The forty-one shares of Norristown Insurance and Water Company stock, for which plaintiffs had paid $50 per share, were sold promptly by them to Barnes & Lofland at $53 per share, but, upon such irregularity having been learned, this sale also failed.

19. Plaintiffs then wrote on the two Montgomery National Bank certificates, below the guarantee of the signature of Michael Liebster, "Signature guaranteed. West & Co.," and requested the bank to transfer the stock on the books of the institution directly to them and issue a new certificate for it in their name. This the bank refused to do.

20. Plaintiffs then wrote on the two oldest Norristown Insurance and Water Company certificates, being *(c)* and *(d)* of our 5th finding, below the guarantee of the signature of Willard Kohn Co., "Signature guaranteed. West & Co.," and wrote upon those of the same company, described in our 6th and 7th findings, above the printed endorsed assignment:

"We hereby irrevocably constitute and appoint          our substitute to transfer the within-named stock under the foregoing power of attorney, with like power of substitution.

"Dated June 25, 1924.                                   WEST & Co.
"Witness: (Name undecipherable.)"

They also wrote or filled their own firm name into the power of attorney on the two last-mentioned certificates which Miss Davis had signed, and underneath the guarantee of Willard Kohn Co.'s signature on these certificates, wrote "Signature guaranteed. West & Co."

And, also, they wrote on the lower left-hand corner of both:

"We hereby irrevocably constitute and appoint West & Co. our substitute to transfer the within-named stock under the foregoing power of attorney, with like power of substitution.

"Dated June 23, 1924.                                   WEST & Co.
"Witness: (Name undecipherable.)"

They then presented said four certificates to Norristown Insurance and Water Company and requested that the stock be transferred on the books of the company directly to them and a new certificate for it issued in their name. This the water company refused to do.

21. The present bills were filed on Oct. 27, 1924, and they pray for decrees ordering such transfers and the issuance and delivery to plaintiffs of new certificates for the stock by the proper defendant corporation.

22. Plaintiffs have possession of all six of the stock certificates mentioned in our 5th, 6th and 7th findings.

23. By the custom which prevails, only the last signature appearing on the back of a stock certificate needs to be guaranteed to a purchaser, and such guarantees, when made by stock exchange houses and officers of national banks, are accepted.

24. At the time of hearing, none of the four certificates mentioned and described in our 5th finding had endorsed upon or attached to it an assignment or power of attorney to transfer it. Counsel for plaintiffs then offered to type such on each above the signatures endorsed thereon. The offer was objected to and the objection was sustained.

25. It is the custom of the trade, in the negotiation and transfer of stocks, where the owner has endorsed the certificate in blank, afterwards to write over the signature an assignment and power of attorney.

26. Mary Ann Davis having been allowed to intervene as a party defendant in both cases and having filed cross-bills therein, all interested parties are before the court.

### Discussion.

Courts have shown a constant tendency to protect *bona fide* purchasers of certificates of stock. The trend of modern decisions has been to encourage the free circulation of stock certificates . . . on the theory that they are a valuable aid to commercial transactions, and that the public interest is best subserved by removing all restrictions against their circulation and by placing them as nearly as possible on the plane of commercial paper: Masury *v.* Arkansas Nat. Bank, 93 Fed. Repr. 603.

There is no serious controversy as to any of the relevant facts. With them established, the real difficulty is to be found in drawing from them the correct conclusions or results, and it has been sought to make this task the easier and, at the same time, to obviate the necessity of a lengthy discussion of the case by finding its facts in painstaking detail.

Miss Davis is old and both physically and mentally slightly impaired. She has, however, never been adjudicated as unable to care for her property, and the testimony indicates that, until this occurrence, she had looked after and added to it with a considerable degree of success. She had had some experience in the purchase and sale of securities—more as to the former than the latter, however—knew that when stock was sold the certificate was signed on the back by the owner, and, apparently, was both penurious and crafty. She had never made an income tax return nor paid such a tax.

When the swindler, who called himself Seymore, arrived, he found her an easy mark, not so much because of her mental condition, as because she had, in her love of money, made herself amenable to the law. When he left he carried with him virtually all of her valuable securities. Her purpose in turning them over to him—the intention that she may have had in her mind when doing so—is, under the facts, of little, if any, interest. But what she actually did at the time is very relevant.

She delivered to him physical possession of not only the six certificates involved here, but many others. All, except the four mentioned in our 5th finding, had been endorsed with blank assignments and powers to transfer. These four very old certificates were the only ones without such. She had affixed her genuine signature on the back of each, and it was witnessed by Seymore. Where a certificate carried a blank assignment and power, she had signed it at the proper place—its end. Where it did not, she had affixed her name at such a place as to allow space for the writing above of such assignment and power. This fact is regarded as relatively very important. Had her signature on these four certificates been written so near the top as not to permit such to be done, the effect might not have been the same. The only thing that was not done that could have been done was to write, or have written, on these four old certificates the blank assignments and powers above the signature which were already printed on all the rest.

Moreover, this was all done at the same time; all the certificates were delivered to Seymore at that time; they included her holdings of stock in at least ten corporations, and amongst the lot were four certificates of Norristown Insurance and Water Company, two of which had printed on their backs blank assignments and powers and two of which were without such. The conclusion is irresistible that, under these facts, Miss Davis gave to Seymore the *indicia* of ownership of all her stock, the certificates for which she delivered to him.

West & Co. *v.* Montgomery National Bank et al.

Every one of these certificates came in a short time, and in regular course of their perfectly legitimate business, into the possession of plaintiffs, who are a reputable concern. That they bought them in good faith and for value is not open to controversy. That they took them without notice, either actual or implied, of the infirmity of Tilden, Reade & Co.'s title, or of the wrong that had been done by Seymore to Miss Davis, is, in our opinion, equally well established. It is, however, not at once apparent how this question can arise under the facts as to the two certificates mentioned in our 6th and 7th findings, and the only thing that differentiates the four mentioned in our 5th finding from these two is the absence of the blank assignment and power over the signature of Miss Davis.

West & Co. did not, of course, know during their negotiation in whose name the certificates involved had been made out. They had not been offered a single certificate or stock in but one corporation. When they had bought and received deliveries they, for the first time, saw the certificates. All were in customary and similar condition, except as to the four old certificates, and, as stated, the only difference as to them was the absence of the blank assignment and power over the signature of Miss Davis. Under all the circumstances as they existed at that time and confronted plaintiffs, this fact alone was not, in our opinion, sufficient to put them on inquiry.

The dates of these certificates showed them to have been issued before it had become customary to print blank assignments and powers on the back of stock certificates. Their absence was thus accounted for. Miss Davis's name had been written at such a place as reasonably to indicate that she had intended such to have been afterwards written above; these four certificates were accompanied by many others, and all had been originally issued to the same individual; and, so far as the two old water company certificates are concerned, they were actually accompanied by two others, issued much later by the same corporation to Miss Davis, having blank assignments and powers printed upon their backs. West & Co. were, as to all of the six certificates involved here, purchasers for value in good faith without notice of any facts making the transfer wrongful.

For that matter, we do not attach the same controlling importance to the absence of the blank assignments and powers from the four old certificates as is given by counsel for defendants. It is unnecessary here to discuss the negotiability of stock certificates, the law on which subject is well settled. They are not negotiable by mere endorsement freely as is commercial paper. And yet the Uniform Stock Transfer Act of 1911 says in its 20th section, in so many words, that a certificate is endorsed when the signature of the person appearing by the certificate to be the owner of the shares represented thereby is written without more upon the back of the certificate. This act applies, of course, only to certificates issued after it became effective and is not to be understood as affecting the rights of parties as between themselves. Its purpose was to make uniform the law relating to transfers of stock and, generally and almost entirely, it was declaratory of the existing law.

Had the four old certificates been dated after Jan. 1, 1912, they would have been sufficiently endorsed by the presence of Miss Davis's name without more thereon, and there is respectable authority for holding that this has always been the law in Pennsylvania. Judge Paxson, afterwards Chief Justice, in a *dictum* in Wood *v.* Maitland, 10 Phila. 84, said a certificate of stock might be transferred by a blank endorsement, which might be filled up by the holder by writing an assignment and power of attorney over the signature endorsed, and he relied on the New York case of Kortland *v.* The Buffalo Commercial

West & Co. v. Montgomery National Bank et al.

Bank and Angell and Ames on Corporations. The Kortland case, which is to be found reported in 20 Wendell, 90, is of especial interest in this connection, because that is precisely what was done there. One Barker had endorsed his certificate with his name and seal and a subsequent holder had filled up the blank transfer by writing over his name and seal an assignment and power which the lower court held was but the execution of an authority clearly conveyed to him, lawful in itself and convenient to all parties. In other words, it was there decided, so early as 1838, that a certificate of stock was transferable by a blank endorsement, which might be filled up by the holder by writing an assignment and a power of attorney over the signature endorsed. The judgment of the Supreme Court was affirmed by the Court of Errors in 22 Wendell, 348.

In construing an assignment of corporate stock, the court should take into account surrounding facts and circumstances, and the assignment is not required to be in any particular form: Holmes v. Holmes, 196 N. W. Repr. 248.

Miss Davis, therefore, not only delivered the six certificates in question to Seymore, but, by her endorsement of them under all the facts and circumstances, entrusted to him the indicia of their ownership.

Plaintiffs ultimately and promptly thereafter acquired them by purchase in regular course of business, in good faith, for value and without notice, actual or implied, of the wrong that had been done her. In consequence, they obtained a good title to all. One who delivers stock to another accompanied by power of attorney for the transfer thereof clothes such other person with apparent ownership, and a bona fide purchaser or pledgee for value thereof from such apparent owner obtains a good title: Little v. Fearon & Co., 252 Pa. 430. And this is so here, regardless of any private understanding between Miss Davis and Seymore.

Moreover, Miss Davis is, in view of all the circumstances, estopped against asserting title to any of the stock in question as against the plaintiffs: Wood's Appeal, 92 Pa. 379; Little v. Fearon & Co., 252 Pa. 430; Shattuck v. American Cement Co., 205 Pa. 197. And this is especially true, if for no other reason, because of her clearly established negligence in the manner in which she parted with the certificates. The equities, as between her and plaintiffs are not equal. Where one of two innocent persons is to suffer from the tortuous act of a third, he who gave the aggressor the means of doing the wrong must alone bear the consequences of the act: Bank of Kentucky v. Schuylkill Bank, 1 Parson's Equity Rep. 248; Pennsylvania R. R. Co.'s Appeal, 86 Pa. 80. The underlying principle in all our cases of this class is well and aptly expressed in the first syllabus to Hale's Estate, 3 D. & C. 287, as follows: "A bona fide purchaser of stock for value, without notice that such stock had been wrongfully taken by the vendor or pledgor from the true owner, is entitled to hold the stock as against the owner, whose loose business methods made possible the transfer of the stock." As between plaintiffs and Miss Davis, title to all the stock embraced in the six certificates involved here is in the former and she will not be heard to attack it.

The only case to which our attention has been directed by counsel for defendants which holds to the contrary is Boston Safe Deposit and Trust Co. v. Adams (Mass., 1916), 113 N. E. Repr. 277, but its facts are distinguishable from those before us. The same is also true of Treadwell v. Clark, 114 N. Y. App. Div. 493; 190 N. Y. 51; and Gillett v. Chicago T. & T. Co., 230 Ill. 373. In the Boston case the owner had signed his name on the back of the certificate immediately below some matter printed thereon.

It does not appear whether or not a blank assignment and power also was printed on the back of the certificate, but there was no space above the signature sufficient to allow such to be written there.

In our own case the name was written at such a place on the back of all four of the old certificates as to allow space for a blank assignment and power to be written above it; they were accompanied by many others, including two more-recent water company certificates, in proper and usual form; and their appearance and all the circumstances led plaintiffs to the reasonable inference, which was impossible in the Boston case, that Miss Davis had intended her signatures to operate as transfers in blank with the formal assignments and powers to be written in afterwards by some subsequent holder.

So far as the four old certificates are concerned, however, the plaintiffs are not presently entitled to decrees against the corporations compelling their transfer on their books. They continue unendorsed by formal assignments and powers and, so long as they remain in this condition, the defendant corporations should not be compelled to act.

Since the final hearing, but before it was determined how the case was to be decided, the trial judge suggested that this technical difficulty might be overcome by stipulation of the parties, but the suggestion was not heeded. We have no alternative at this time, therefore, as this feature of the case is viewed, except to refuse decrees against the defendant corporations as to the four old certificates, but without prejudice to plaintiffs hereafter to file new bills after assignments and powers have been written upon the backs of these certificates above the signature of Mary Ann Davis.

From the facts as thus found, we draw the following

## Conclusions of law.

1. As to all four of the certificates mentioned and described in our 5th finding of fact and the stock represented thereby, plaintiffs are not at this time entitled to the decrees against defendant corporations for which they pray in their respective bills. The relief sought is against the corporations, and it is to compel transfers of the stock and the issuance of new certificates to plaintiffs. The old certificates were not negotiable, as in the case of promissory notes, and mere endorsement thereof by signature of their owner, without assignment or power to transfer, does not constitute authority in defendant corporations sufficient either to justify or to require them to make the transfers and issue the new certificates.

2. As to all four of the certificates mentioned and described in our 5th finding of fact and the stock represented thereby, the delivery of the certificates by Mary Ann Davis, with the endorsement thereon of her signature, under all the circumstances, passed the title thereto.

3. As to all four of the certificates mentioned and described in our 5th finding of fact and the stock represented thereby, Mary Ann Davis is, under all the circumstances, estopped from being heard to object to the prayers of the bills being granted.

4. That as to all four of the certificates mentioned in our 5th finding and the stocks represented thereby, respectively, plaintiffs having purchased them in good faith, for value and without notice, and Mary Ann Davis having entrusted to Seymore, with possession of the certificates, written evidence of title to and power of disposition over them, she conferred upon him all the *indicia* of their ownership and is estopped to assert title to them as against plaintiffs.

5. As to all four of the certificates mentioned and described in our 5th finding, Mary Ann Davis, intervening defendant, is not entitled to decrees ordering and requiring plaintiffs to surrender and deliver them to her.

6. As to certificate No. 2429 of the Norristown Insurance and Water Company, being that mentioned and described in our 6th finding of fact, and the nine shares of stock represented thereby, plaintiffs are entitled to the decree against defendant corporation in suit No. 5, September Term, 1924, for which they pray. While this certificate was issued before the taking effect of the Uniform Stock Transfer Act, which, therefore, does not apply, it, when delivered by Mary Ann Davis, owner of it and the stock represented by it, and also when received by plaintiffs, was lawfully endorsed in blank, in that it had upon its back an assignment and irrevocable power of attorney to transfer signed or executed by her. Because thereof, it was in the position of merchandise prepared for market, and Mary Ann Davis is estopped to assert title to it as against plaintiffs. The Norristown Insurance and Water Company may not refuse to make a transfer thereof on its books and issue a new certificate to plaintiffs. As to this certificate, the Uniform Stock Transfer Act is merely declaratory of the law as it existed when the act was passed.

7. As to certificate No. 3074 of the Norristown Insurance and Water Company, being that mentioned and described in our 7th finding of fact, and the four shares of stock represented thereby, plaintiffs are entitled to the decree against defendant corporation in suit No. 5, September Term, 1924, for which they pray. The Uniform Stock Transfer Act of May 5, 1911, P. L. 126, went into effect on Jan. 1, 1912; said certificate was issued after the taking effect of the act; when delivered by Mary Ann Davis, it was endorsed in blank within the provisions and meaning of the act; and it was lawfully transferred to plaintiffs.

8. That as to the two certificates mentioned in our 6th and 7th findings and the stock represented thereby, respectively, plaintiffs purchased them from their apparent owner in good faith, for value and without notice of infirmity of title or any equity in Mary Ann Davis.

9. That the intervening defendant, Mary Ann Davis, should pay the costs of both cases.

The following decrees *nisi* are entered:

And now, Dec. 28, 1925, upon consideration of the foregoing case, No. 4, September Term, 1924, it is ordered, adjudged and decreed as follows:

That title to certificates Nos. 83 and 847 for six and four shares, respectively, of the capital stock of Montgomery National Bank of Norristown, mentioned and described as "(a)" and "(b)" in our 5th finding of fact, is in plaintiffs, and Mary Ann Davis is estopped against asserting to the contrary, but that, as to the corporation defendant, the prayer of the bill be denied without prejudice, and that the intervening defendant pay the costs.

And now, Dec. 28, 1925, upon consideration of the foregoing case, No. 5, September Term, 1924, it is ordered, adjudged and decreed as follows:

That title to certificates Nos. 2110 and 2173 for twenty-five and three shares, respectively, of the capital stock of Norristown Insurance and Water Company, mentioned and described as "(c)" and "(d)" in our 5th finding of fact, is in plaintiffs, and Mary Ann Davis is estopped against asserting to the contrary, but, as to the corporation defendant, that the prayer of the bill, as to these two certificates, be denied without prejudice; that, as to certificates Nos. 2429 and 3074 for nine shares and four shares, respectively, of the capital stock of the same company, being those mentioned and described in our 6th and 7th findings of fact, plaintiffs, and not Mary Ann Davis, the

West & Co. v. Montgomery National Bank et al.

intervening defendant, are the owners thereof, and, as such, entitled to the relief for which they pray. The prayer of their bill is, as to the two last-mentioned certificates, therefore, granted and Norristown Insurance and Water Company, the original defendant, is ordered, whenever, after final decree, said certificates are surrendered and delivered to it, forthwith to transfer them and ownership of the stock which they represent on the books of the company into the names of the plaintiffs or under their direction, and to deliver to the transferee or transferees new and proper certificates therefor, and that the intervening defendant pay the costs.

And it is further ordered, adjudged and decreed that this adjudication shall be filed in No. 4, September Term, 1924, and thereby become part of the record in both of said cases, and that the prothonotary shall enter these decrees *nisi*, each in its proper case, and give prompt notice thereof to the parties or their counsel of record.

From Aaron S. Swartz, Jr., Norristown, Pa.